William WATTLETON, et al., Plaintiffs,

and

Steve T. Tillman, et al.,
Plaintiffs-Intervenors,

v.

LADISH CO., et al., Defendants.

Civ. A. No. 75–C–746.

United States District Court,
E. D. Wisconsin.

Aug. 5, 1981.

Percy L. Julian, Jr., Madison, Wis., Jonathan Wallas and Julius Chambers, Charlotte, N. C., for plaintiffs and intervenors.

Lawrence Classen, Madison, Wis., for plaintiffs.

Merrick R. Domnitz, Milwaukee, Wis., for plaintiff Raymond Beasley.

David E. Jarvis and Fred Groiss, Milwaukee, Wis., for defendant Ladish Co.

Steven J. Hajduch, Milwaukee, Wis., for defendant International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, Local No. 1509.

Robert E. Gratz, Milwaukee, Wis., for defendants International Federation of Professional and Technical Engineers, Local No. 92, and International Ass'n of Machinists and Aerospace Workers, Local No. 1862.

Hamilton Hoyt, Milwaukee, Wis., and Richard Lyman, Toledo, Ohio, for defendant International Brotherhood of Firemen and Oilers, Local No. 125.

George F. Graf and Miriam Horwitz, Milwaukee, Wis., for defendant Associated Unions of America, Local No. 500.

Alan Levy and Albert J. Goldberg, Milwaukee, Wis., for defendant International Brotherhood of Electrical Workers, Local No. 494.

Albert J. Goldberg, Milwaukee, Wis., and Lloyd F. Engle, Pittsburgh, Pa., for defendant International Die Sinkers Conference and Milwaukee Die Sinkers, Lodge No. 140.

REYNOLDS, Chief Judge.

This is a civil rights action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981, as well as a breach of fair representation action brought pursuant to 29 U.S.C. § 151 et seq. This court has jurisdiction under 28 U.S.C. § 1343(3), 42 U.S.C. § 2000e–5(f)(3) and 28 U.S.C. §§ 2201 and 2202.

On March 30, 1981, the trial of the above-entitled action commenced. The trial lasted seven days. At the conclusion of trial on April 7, 1981, the Court rendered its decision from the bench and announced that the reasons for the Court's ruling would be set forth in a decision which would follow at a later date. Following an introduction necessary for a full understanding of this case, the Court shall make its findings of fact and state its conclusions of law thereon.

I. *INTRODUCTION*

In 1974, plaintiff Johnnie Robinson went to the Milwaukee office of the Equal Employment Opportunity Commission ("EEOC") with the intent to file a charge of employment discrimination against his employer, The Ladish Company ("Ladish"). EEOC personnel, however, advised Robinson that in order to secure proper redress, he should obtain the names of every union that represented employees at Ladish. In accordance with that advice, on June 5, 1974, Robinson filed a charge of employment discrimination with the EEOC, naming as respondents Ladish and the following seven unions: (1) International Federation of Professional and Technical Engineers, Local # 92 ("IFPTE"); (2) International Brotherhood of Firemen and Oilers, Local # 125 ("IBFO"); (3) International Brotherhood of Electrical Workers, Local # 494 ("IBEW"); (4) Associated Unions of America, Local # 500 ("AUA"); (5) International Die Sinkers Conference and Milwaukee Die Sinkers, Lodge # 140 ("Die Sinkers"); (6) International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers, Local # 1509 ("Blacksmiths"); and (7) International Association of Machin-

ists and Aerospace Workers, District No. 10, Local # 1862 ("Machinists"). Robinson alleged:

"Prior to 1968, Ladish Company maintained a segregated hiring policy wherein all Black workers were hired into Union contracted Machinist jobs, which were the lowest paying jobs available at the Company. Such a policy has led to a current and continuing system of discrimination in seniority, wages and promotion. As a Black employee, I and others similarly situated, have been discriminated against as a result of Ladish's past policies of segregated hiring and resultant seniority and salary system. The affiliated Unions have contributed to this discrimination via the Union Contracts." (Plaintiffs' Exhibit 1)

On October 3, 1975, Robinson was notified by letter from the EEOC of his right to bring suit in the appropriate United States District Court within ninety days of receipt of the letter. He and ten other black employees of Ladish commenced this action on December 29, 1975, on behalf of themselves and all others similarly situated. Eight of the other named plaintiffs had filed EEOC charges on the dates set forth below:

| Name | EEOC Charge Filed |
| --- | --- |
| William Wattleton | July 28, 1975 |
| Wardell Wilson | August 30, 1975 |
| Daniel Brown | August 30, 1975 |
| Robert Spearmon | August 30, 1975 |
| Clarence Suggs | August 30, 1975 |
| Ruben Madison | September 20, 1975 |
| John Armstrong | October 30, 1975 |
| Clayton Jacobs | October 31, 1975 |

On March 31, 1977, these eight plaintiffs were notified by letters from the EEOC of their rights to bring suit, and an amended complaint was filed on May 3, 1977.[1]

Several other black Ladish employees had filed EEOC charges. Their names and the dates on which they had filed their EEOC charges are set forth below:

| Name | EEOC Charge Filed |
| --- | --- |
| Steve T. Tillman | April 15, 1976 |
| William Bell | April 15, 1976 |

| | |
| --- | --- |
| Charles Jones | April 20, 1976 |
| Tommie L. Ballet | July 1, 1976 |
| Willie Queary | July 1, 1976 |
| Charles C. Graves | July 1, 1976 |
| Henry E. Graves | July 1, 1976 |

On March 31, 1977, these seven persons were notified by letter from the EEOC of their rights to bring suit. A complaint in intervention was filed on their behalf on May 3, 1977.

This court on June 13, 1977, granted the plaintiffs' motion to file an amended complaint and the plaintiffs-intervenors' motion to intervene. (Hereinafter the plaintiffs and the plaintiffs-intervenors will be referred to as "plaintiffs.")

On February 12, 1980, the Court granted in part the plaintiffs' motion for class certification and certified the class of plaintiffs as follows:

" * * * [F]or the purpose of determining the first claim, i. e., whether the seniority system maintained by the defendants * * * is a 'bona fide seniority system' within the meaning of § 703(h) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), this action is hereby certified as a class action on behalf of all blacks hired by the Ladish Company prior to January 22, 1968, who (1) were hired by the Ladish Company for jobs that were within the jurisdiction of the International Association of Machinists and Aerospace Workers, Local 1862, and (2) were employed by the Ladish Company as of December 30, 1969." *Wattleton v. Ladish*, No. 75–C–746 (E.D.Wis., Feb. 12, 1980, at page 7).

On the same date the Court granted the plaintiffs' motion to sever the issue of liability from the issue of damages and remedies in the event liability was established. *Id.*

In a status conference held on November 3, 1980, the plaintiffs and certain defendants informed the Court that they were prepared to settle all issues that remained

---

1. The record does not show that two of the named plaintiffs, Abraham Leflore and Fred J. Colin, ever filed EEOC charges. This fact was

of no apparent matter to the defendants and is of no matter to the Court since each is a § 1981 plaintiff and each would be a class member.

in this action. Accordingly, the Court determined that a hearing on the proposed settlement should be held on December 22, 1980. In furtherance thereof, on November 7, 1980, the court issued a notice of hearing to consider and approve the proposed consent decree and an order implementing the hearing to consider the same and providing for notice of the hearing. The notice of hearing and proposed consent decree were mailed to the class members on November 19, 1980.

On December 22, 1980, the Court conducted a lengthy hearing for the purpose of hearing approvals or objections to the proposed consent decree. In an opinion dated February 13, 1981, after reviewing the proposed consent decree in light of many factors, this Court approved the consent decree. See *Wattleton v. Ladish Co.*, 89 F.R.D. 677 (E.D.Wis.1981). The effect of the consent decree was to settle all issues in this action between the plaintiffs and Ladish, IFPTE, IBFO, IBEW, and AUA, and to set down for trial this action between the plaintiffs and the Die Sinkers, Blacksmiths, and Machinists.

Left remaining for trial on March 30, 1981, were the plaintiffs' contentions that (1) Ladish, with the full knowledge, cooperation, and complicity of the Machinists, Blacksmiths, and Die Sinkers, maintained a policy and practice of hiring blacks for and assigning them to the dirtiest, lowest paying, and least desirable jobs within the jurisdiction of the Machinists;[2] (2) Ladish, with the acquiescence of the Machinists, Blacksmiths, and Die Sinkers, maintained a policy of refusing to promote and transfer blacks to better paying and more desirable jobs within the jurisdictions of the Machinists, Blacksmiths, and Die Sinkers;[3] (3) the Machinists, Blacksmiths, and Die Sinkers, by reason of seniority systems within their respective collective bargaining agreements, perpetuated the initial discrimination against blacks because their seniority systems prevented blacks from transferring to better paying and more desirable jobs

within their respective jurisdictions without full carryover seniority; and (4) the Machinists' bargaining unit has failed to properly and fairly represent its black members.

## II. FINDINGS OF FACT

The following constitute the Court's findings of fact pursuant to Rule 52 of the Federal Rules of Civil Procedure. These findings will be grouped into introductory matters and according to the issues raised at trial by the parties.

### A. Introductory Matters: The Parties, The Communities, and The Workforce at Ladish

1. Plaintiffs are all black citizens and residents of the United States as well as present or former employees of Ladish and present or former members of the Machinists. All plaintiffs were hired by Ladish prior to January 1, 1968, and were initially placed into jobs under the jurisdiction of the Machinists.

2. Ladish, with one of its principal facilities in Cudahy, Wisconsin, is a major employer in the Milwaukee area and is an employer within the meaning of 42 U.S.C. § 2000e(b); it currently employs in excess of 5,000 employees, 4,000 of whom are under the jurisdiction of bargaining units. Ladish makes custom fittings and forgings for its customers but makes no products of its own. Among its customers is the United States, with government contracts for jet engine parts and other military parts constituting approximately 50 per cent of Ladish's business. This action involves only Ladish's Cudahy facility. Ladish was one of the settling defendants.

3. The Die Sinkers represent all employees of Ladish who are engaged, directly or indirectly, in producing and maintaining all dies, parts of dies, and models which are used in the production and completion of forgings. The crafts of the journeymen Die Sinkers are highly skilled, perhaps the most highly skilled at Ladish, and are achieved

---

**2.** Absent Ladish as a party defendant to this action, the Court is well aware that in making its findings of fact, the Court may be required to find facts not admitted to by Ladish in the consent decree.

**3.** See footnote 2 and accompanying text.

through extensive apprenticeship programs that are federal and state indentured and approved. Entry into one of these apprenticeship programs is accomplished through bidding from the bargaining unit employees at such times when Ladish determines the existence of openings in the programs and posts these openings for bids.

4. The Blacksmiths represent approximately 1,000 of the 4,000 bargaining unit employees at Ladish. Blacksmiths, generally speaking, are engaged, directly or indirectly, in forming and shaping raw materials into forgings. Blacksmith jobs in the forge shop, particularly those involving work around hot furnaces and drop hammers, require physical strength and an ability to withstand adverse working conditions.

5. The Machinists represent approximately 2,000 of the 4,000 bargaining unit employees at Ladish. Machinists, generally speaking, take forgings and then machine and inspect them, and finally ship finished products. As recited above, all plaintiffs and the class that they represent were hired by Ladish for jobs under the jurisdiction of the Machinists and were employed by Ladish as of December 30, 1969.

6. Cudahy, Wisconsin, is an area populated primarily by whites. Few blacks, to the present time, have lived in Cudahy.

7. Few blacks lived in the Milwaukee area prior to World War II. After this war, blacks began to migrate northward and came to settle in the Milwaukee area. The black population in Milwaukee and the Milwaukee area has increased steadily and significantly since World War II. Unquestionably, blacks were generally limited to purchasing homes and renting apartments in certain areas of Milwaukee, and these living arrangements were generally substandard. In Milwaukee during the 1950's, there was evidence of racial discrimination in jobs, housing, schools, and everyday social contacts.

8. In 1973 and 1974, the Office of Federal Contract Compliance ("OFCC") conducted an audit of Ladish's Cudahy facility.

This audit included an analysis of Ladish's then existing work force.[4] In response to requests of the OFCC, Ladish prepared a detailed analysis of its work force. Exhibit A, attached hereto, is an analysis of the Cudahy hourly employees hired from August 1948 to December 1967, and a distribution of those hirings by bargaining units. Exhibit B, attached hereto, is an analysis of those minorities hired by Ladish prior to January 1, 1968, and still employed by Ladish in 1974, and a distribution of those hirings by bargaining unit.

9. A review of these Exhibits A and B and the trial testimony reveal the following. Apparently no blacks were hired by Ladish prior to 1948. Between 1948 and 1968, Ladish hired 190 blacks who were still employed as of the OFCC audit in 1974. All of these blacks hired between 1948 and 1968 and still employed in 1974 were initially placed into jobs under the jurisdiction of the Machinists. None of these blacks were initially placed into jobs under the jurisdiction of any other bargaining unit at Ladish, including the Blacksmiths and the Die Sinkers. During the same time period, 1948–1968, Ladish hired and initially placed 119 nonblack employees into jobs under the jurisdiction of the Die Sinkers; 375 nonblack employees into jobs under the jurisdiction of the Blacksmiths; 30 nonblack employees into jobs under the jurisdiction of the IBEW; 4 nonblack employees into jobs under the jurisdiction of the IBFO; 118 nonblack employees into jobs under the jurisdiction of the IFPTE; 154 nonblack employees into jobs under the jurisdiction of AUA; as well as 311 nonblack employees into nonunion jobs. In addition to the 190 blacks hired and initially placed into jobs under the jurisdiction of the Machinists during the period 1948–1968, there were 1,074 nonblacks similarly hired and initially placed into Machinists' jobs.

10. A closer review of the exhibits reveals that on seventy dates throughout the 1948–1968 time period, nonblack employees

4. The details and conclusions of the OFCC audit are discussed in the Court's findings of fact numbered 17 and 25.

were hired and initially placed into jobs under the jurisdiction of bargaining units other than the Machinists, while on the same dates 81 black employees were hired and initially placed into jobs under the jurisdiction of the Machinists.

11. Finally, these exhibits reveal that no blacks were initially placed into jobs under the jurisdiction of the Blacksmiths until after January 1, 1968, and that no blacks were initially placed into jobs under the jurisdiction of the Die Sinkers prior to December 1967. Thus, beginning in January 1968, Ladish began hiring, assigning, and transferring blacks into jobs under the jurisdiction of bargaining units other than the Machinists.

B. *The Minimal Qualifications Required by Ladish from Applicants Seeking Employment*

12. The minimum requirements for the great majority of jobs at Ladish are simple literacy and good health. Although Ladish has sought out skilled craftsmen to fill certain of the journeymen jobs and apprenticable trades at Ladish, most employees have been hired for entry level jobs with little, if any, job skills; consequently, most employees have learned their skills while on the job.

13. Ladish maintains apprenticeship programs for certain jobs under the jurisdiction of the Machinists and the Die Sinkers. There are no apprenticeship programs under the jurisdiction of the Blacksmiths, although there are learnership programs.

14. Ladish has traditionally maintained a policy of giving special favorable consideration to the relatives of incumbent employees. Indeed, employees have been encouraged to recommend relatives or friends to Ladish to fill job vacancies.

15. The absence of placements of blacks into jobs under the jurisdiction of the Blacksmiths and the Die Sinkers between 1948–1968 is not explained by a comparison of employee qualifications. Most white employees placed into jobs under the jurisdiction of the Blacksmiths during the period 1948 to 1968 had neither a distinguishing education nor job skills which would have

qualified them especially for work with the Blacksmiths. Based on the testimony, the Court finds that most employees hired at Ladish were unskilled with respect to the jobs they were placed into and that they learned the skills related to their jobs while working on the job. The Court further finds that there is no evidence in the record that the blacks hired between 1948 and 1968 were less skilled, less qualified, or less apt to learn job skills than the whites hired during this same time period.

16. The right to determine qualifications, hire, place initially within a bargaining unit, and promote have been and remain the sole responsibility and exclusive right of Ladish. In particular, neither the Machinists, nor the Blacksmiths, nor the Die Sinkers, since certification as a bargaining unit, has ever had control over or participation in the hiring, placement, or promotion of employees at Ladish. The Court further finds that with one exception for the Ladish-Blacksmiths' collective bargaining agreements effective August 22, 1949, the right to transfer has been and remains the sole responsibility and exclusive right of Ladish. In particular, neither the Machinists nor the Die Sinkers, since certification as a bargaining unit, has had control over or participation in the transfer of employees at Ladish.

C. *The Details and Conclusions of the OFCC Audit of Ladish's Workforce*

17. As noted above, the OFCC conducted an audit of Ladish's workforce in July 1973. This audit eventually focused on whether the then existing workforce had an "affected class." An affected class consists of those employees who by virtue of past hiring discrimination and by the nature of the limited seniority carryover provisions of the pertinent collective bargaining agreements were in a position that they continued to suffer the present effects of past discriminatory acts. Based on the audit, the OFCC concluded in September 1973 that an affected class existed at Ladish, consisting of all blacks who were hired by Ladish prior to January 22, 1968, and who

were placed by Ladish into jobs under the jurisdiction of the Machinists. Ladish has never agreed with the OFCC's determination that an affected class exists at Ladish.

18. Also in September 1973, the OFCC made a proposal to Ladish regarding relief for the affected class and directed that Ladish take certain actions regarding that proposal. In particular, the OFCC proposal allowed members of the affected class to transfer from jobs under the jurisdiction of the Machinists into jobs under the jurisdiction of other bargaining units at Ladish with full carryover seniority for all purposes.

19. Pursuant to OFCC directions, two members of Ladish's personnel and labor relations staff, Richard Junas and Harry Lau, conducted individual interviews with most of the members of the affected class in January and February 1974. These individual members were asked hypothetically whether they would be interested in transferring with full carryover seniority for all purposes to a job under the jurisdiction of a bargaining unit other than the Machinists. The results of the individual interviews were then compiled. Approximately one-half of those members of the affected class who were interviewed by Junas and Lau indicated their desire to transfer to a job under the jurisdiction of a bargaining unit other than the Machinists.

20. Subsequently, in March of 1974, Ladish sent a memorandum to each of the bargaining units concerning the OFCC proposal of relief for the affected class. In the memorandum Ladish, inter alia, (1) indicated the number of members of the affected class who had expressed an interest in transferring to jobs under the jurisdiction of that bargaining unit, (2) expressed its willingness to allow members of the affected class to transfer to jobs under the jurisdiction of that bargaining unit with full carryover seniority for all purposes, and (3) requested that members of the affected class who had expressed an interest in transferring to jobs under the jurisdiction of that bargaining unit be allowed to do so. For example, in its memorandum to officials of the Blacksmiths, Ladish indicated that sixty-nine members of the affected class had, during the interviews described above, expressed an interest in transferring to jobs under the jurisdiction of the Blacksmiths, indicated its willingness to allow these transfers to the Blacksmiths with full carryover seniority for all purposes, and requested that the Blacksmiths go along with such transfers.

21. The testimony at trial indicated that the transfers were to take place only when vacancies became available within the Blacksmiths. Members of the affected class were to be given an opportunity to transfer to those vacancies and to remain in their new jobs for a period of ninety days. In the event that members of the affected class decided to remain in their new jobs within the Blacksmiths after the ninety-day trial period, they were to be given full plantwide seniority for all purposes. In the event that members of the affected class decided to return to their old jobs within the Machinists after the ninety-day trial period, they were to be allowed to do so without loss of any seniority.

22. After their receipt of the Ladish memorandum and proposal concerning the affected class, the various bargaining units met on several occasions to discuss that proposal. The evidence at trial revealed that on one occasion, Mr. Pollard from the Washington headquarters of the AFL–CIO came to Milwaukee to meet with representatives of AFL–CIO affiliated bargaining units. Representatives from the Machinists and the Blacksmiths, inter alia, attended this meeting. Representatives from the Die Sinkers attended the meeting even though the Die Sinkers are not affiliated with the AFL–CIO. The evidence at trial further revealed that although Mr. Pollard and the bargaining unit representatives had discussed the Ladish proposal, neither a response nor a counterproposal was made by any bargaining unit at this meeting. Likewise, the evidence at trial revealed that except for a suggestion made by the Machinists that will be discussed below, neither a response nor a counterproposal was made on any of the several other occasions on which representatives of the various bargaining units had met to discuss the Ladish proposal.

23. At some point during the time that the bargaining units were discussing the Ladish proposal, the Machinists suggested to Ladish that the latter institute full plant-wide seniority for all purposes for all employees in all bargaining units. Ladish, however, was not receptive to the Machinists' suggestion for the reason that it believed that bargaining unit seniority was imperative to the successful operation of its manufacturing processes. This is still Ladish's belief.

24. Subsequently, each of the bargaining units at Ladish indicated to Ladish, either formally or informally, that it was not willing to allow the members of the affected class to transfer from jobs under the jurisdiction of the Machinists to jobs under its jurisdiction with full carryover seniority.

25. For unknown reasons, nothing ever came of the OFCC determination that an affected class existed at Ladish or the OFCC's proposal for relief for affected class members. Apparently these matters became buried in the National Office of the OFCC, with the result that Ladish never had to implement any of the OFCC's recommendations.

### D. *The Details As To Hiring and Job Assignment*

26. In addition to presenting statistical evidence, the plaintiffs and class members offered live testimony regarding their efforts to obtain jobs under the jurisdiction of the Blacksmiths.[5] Clayton Jacobs filled out a written application with Ladish in approximately September 1951, and specifically requested a job in the forge shop, a job under the jurisdiction of the Blacksmiths. Despite having prior forge shop experience while working for Oxen Drop Forge Company in Chicago, Illinois, Jacobs was not hired by Ladish. After being told by a black employee at Ladish that blacks were not allowed to work in the forge shop, Jacobs returned to Ladish and filled out a second written application with Ladish in

approximately October 1951. This time Jacobs did not specifically request a job in the forge shop, and he was hired and assigned to a grinding job under the jurisdiction of the Machinists. A review of the August 7, 1974, Blacksmiths' seniority roster reveals that several nonblack individuals were hired by Ladish during this same time period for jobs under the jurisdiction of the Blacksmiths as follows:

| Name | Date of Hire |
| --- | --- |
| Tony Bertino | 9–5–51 |
| Lee Aasterud | 9–18–51 |
| William Stcharsky | 9–19–51 |
| Leo Woyak | 9–25–51 |
| Robert Wiggins | 9–27–51 |
| Joseph Fleischman | 10–2–51 |
| Dominic Court | 10–2–51 |
| Ivan Knisber | 10–8–51 |
| Leonard Hernandez | 10–17–51 |

27. William Wattleton filled out a written application with Ladish in approximately May of 1955. Prior to completing his application, Wattleton had reviewed the large company bulletin board containing a list of jobs currently available at Ladish. Since it had appeared on the bulletin board that there were jobs available in the forge shop, Wattleton specifically requested a job within the forge shop. Wattleton was not granted his specific request but was hired and assigned to a grinding job under the jurisdiction of the Machinists. A review of the above-mentioned Blacksmiths' seniority list reveals that several nonblack individuals were hired by Ladish during this same approximate time for jobs under the jurisdiction of the Blacksmiths as follows:

| Name | Date of Hire |
| --- | --- |
| Jose Aboytes | 5–2–55 |
| Emil Elm | 5–2–55 |
| James Williams | 5–9–55 |
| Earl Stahl | 5–23–55 |
| Michael Lazor | 5–26–55 |
| Henry Karpinski | 5–26–55 |
| John Schuldt | 5–26–55 |
| Earl Pomasl | 5–26–55 |
| Lester Fritschler | 5–26–55 |

28. At trial, the Blacksmiths introduced into evidence a 1981 seniority roster for the forge shop. This seniority roster is not

---

5. No plaintiff testified regarding his effort to obtain a job under the jurisdiction of the Die Sinkers.

persuasive evidence that no employees were hired by Ladish for jobs within the jurisdiction of the Blacksmiths from 1955 to 1965, inclusive, since this seniority roster simply lists only those employees who were still actively employed at Ladish as of 1981 for a single department under the jurisdiction of the Blacksmiths.

29. A compliance report provided by Ladish to Westinghouse Electric Company in April 1963 shows that Ladish's officials, managers, professional and technical employees, sales workers, and office and clerical staff were virtually all white. More specifically, the racial composition in those categories was as follows:

| Occupation | Whites | Negroes | Others |
|---|---|---|---|
| Officials and Managers | 625 | 0 | 0 |
| Professional Employees | 59 | 0 | 0 |
| Technical Employees | 89 | 0 | 1 |
| Sales Workers | 32 | 0 | 0 |
| Office and Clerical | 809 | 0 | 0 |

30. Having considered all the evidence, including (1) the statistical evidence relating to hiring and initial placement of employees into bargaining units during the period 1948 to 1968; (2) the evidence showing that on seventy dates throughout the period 1948 to 1968 blacks were hired and initially placed into jobs within the Machinists' bargaining unit while on the same dates nonblacks were hired and initially placed into jobs within other bargaining units; (3) the details and conclusions of the OFCC audit of Ladish's workforce; (4) the total lack of evidence showing that blacks hired during the period 1948 to 1968 were less skilled, less qualified, or less apt to learn job skills as nonblacks hired during this same time period; (5) the hiring and placement of employees into nonbargaining unit jobs; and (6) the testimony of the plaintiffs regarding their efforts to obtain a job under the jurisdiction of the Blacksmiths, the Court concludes and so finds that blacks hired at Ladish during the period 1948 to 1968 were virtually limited to jobs under the jurisdiction of the Machinists as a matter of policy or practice by Ladish. This policy or practice is neither supported by the relative qualifications of black and white employees nor explained by any other business reason. The fact is that for a twenty-year period of time, virtually all blacks were placed into jobs under the jurisdiction of the Machinists and were not placed into jobs under the jurisdiction of other bargaining units, and the evidence is overwhelming that this discriminatory hiring and placement by Ladish was intentional.

31. Based on the evidence relating to hiring and job assignment, the Court finds that the Machinists have accepted into membership all persons who were hired and placed into their bargaining unit without regard to race or national origin.

32. Absent any evidence to the contrary, the Court finds that the Die Sinkers have accepted into membership all persons who were hired and placed into their bargaining unit without regard to race or national origin.

33. The testimony adduced at trial also revealed that blacks who were hired by Ladish beginning in 1948 and in increasing numbers beginning in the 1950's were generally assigned to jobs as grinders and truckers within the Machinists' bargaining unit. Although blacks have never constituted more than 10 per cent of the Machinists' bargaining unit workforce, approximately 70 per cent of the grinders were black. These jobs were in fact among the dirtiest, lowest paying, and least desirable under the jurisdiction of the Machinists. The Court is persuaded and so finds that Ladish did not maintain a policy and practice of hiring blacks just for these jobs. Rather, the Court finds that the nonblacks as well as blacks have initially occupied unskilled entry level positions and that nonblacks as well as blacks have had the opportunity by use of a bidding system based solely on seniority to progress to more skilled, higher paying, and more desirable jobs. Understandably, if job skill is not a factor in hiring and assigning a new employee to a job, under the Machinists' internal departmental seniority system which preserves to those already having seniority rights the opportunity to bid and secure the better paying and more desirable jobs, only entry level jobs become available because of their undesirability and relatively low pay.

34. Having carefully considered all the evidence, including the theory of the plaintiffs' expert witness Herbert Hill that all blacks were hired and assigned to the Machinists' bargaining unit pursuant to a tacit agreement between Ladish and all the bargaining units, the Court concludes that the plaintiffs have failed to produce any evidence that the Machinists, Blacksmiths, or Die Sinkers in any way had cooperated with or had acted as accomplices to the Ladish policy and practice of hiring blacks for and assigning them to jobs almost exclusively under the jurisdiction of the Machinists.

E. *The Details As To Employee Transfers*

At trial, the Court heard considerable evidence relating to (1) the operation of the challenged seniority systems as to employee transfers, (2) Ladish's policy for allowing transfers from a job under the jurisdiction of one bargaining unit to a job under the jurisdiction of another bargaining unit, and (3) both Ladish's willingness to allow transfers and individual blacksmith's feelings toward transfers of plaintiffs into jobs under the Blacksmiths' bargaining unit.

35. Supported by evidence that will be summarized infra, the Court finds that the challenged seniority systems generally provided that employees who transferred from a job under the jurisdiction of one bargaining unit to a job under the jurisdiction of another bargaining unit had to forfeit their accrued seniority for purposes of layoff, recall, and job bidding. In terms used by the plaintiffs, the challenged seniority systems required an individual to commit "seniority suicide" upon transfer to a job under the jurisdiction of another bargaining unit.

36. Based on the testimony of John Foley, Vice President of Industrial and Public Relations for Ladish, the Court finds that Ladish maintained a policy for allowing employee transfers from a job under the jurisdiction of one bargaining unit to a job under the jurisdiction of another bargaining unit throughout the period 1948–1968. The Court further finds that Ladish maintained throughout the period 1948–1968 a policy for giving preference or consideration to employees seeking a transfer to a vacancy over individuals seeking hire to a vacancy. This preference or consideration was determined on the basis of plantwide seniority and ability to perform the vacant job. Finally, the Court finds that there was a proper procedure to follow when seeking a transfer to a job under the jurisdiction of another bargaining unit throughout the period 1948–1968. That procedure required the employee to contact Ladish's personnel department and to file some sort of transfer application form with the personnel department. Information regarding transfer procedures at Ladish passed primarily by word of mouth until after 1974.

37. Several plaintiffs testified regarding Ladish's willingness to allow transfers and individual blacksmith's feelings toward transfers of the plaintiffs to jobs under the jurisdiction of the Blacksmiths. Herman Banks was one of the plaintiffs who testified. Banks was hired as a grinder in the Machinists' bargaining unit on February 21, 1952. In May or June of 1953, Banks noticed that a job had been posted on the bulletin board for a helper on the number 10 hammer. This job was and is a job under the jurisdiction of the Blacksmiths. Banks, who wanted to transfer to that job, signed and filed a job bid for it. No incumbent blacksmith apparently bid on that job, so that Banks was the bidder with the most plantwide seniority for the job. His bid was rejected, however, because he was a Machinist bidding on a job under the jurisdiction of the Blacksmiths. Banks testified that subsequently he was taken by a company official and a Blacksmith steward to see George Bitters who was then Ladish's director of labor relations and personnel. Banks claimed that he was denied a transfer to the Blacksmiths' bargaining unit because of some papers he was shown, i. e., an agreement between Ladish and the Blacksmiths to keep blacks out of jobs in the Blacksmiths' bargaining unit, and because of some talk about his transfer causing a strike in the Blacksmiths' bargaining unit. After this experience, Banks never repeated his attempt to transfer into a job under the jurisdiction of the Blacksmiths.

38. On cross-examination, Banks could remember neither the name of the blacksmith steward who had accompanied him to Bitter's office nor any details concerning the alleged agreement between Ladish and the Blacksmiths. Moreover, Banks admitted that he had never attempted to follow Ladish's procedure governing transfers. The Court is persuaded that Banks' testimony regarding an agreement between Ladish and the Blacksmiths is sketchy, but I am persuaded that Bank's experience left him with the impression that he could not transfer into the Blacksmiths' Union, and that the Union and the company intended that he get that impression.

39. Abraham Leflore was hired as a grinder on February 2, 1952. Leflore heard some talk that the income potential of jobs in the Blacksmiths' bargaining unit was greater than his own job as a grinder. In late 1952 or early 1953, he noticed that a job under the jurisdiction of the Blacksmiths had been posted on the bulletin board. Leflore bid on this job. His bid was torn up by. a Ladish official, however. Thereafter, Leflore expressed repeatedly his interest in transferring to a higher paying job under the jurisdiction of the Blacksmiths, though he never was allowed to effect such a transfer. The reason, Leflore testified, was his belief that Ladish wanted to avoid the strike by the Blacksmiths' bargaining unit that would have occurred in the event a black was allowed to transfer into the Blacksmiths' bargaining unit.

40. On cross-examination, Leflore admitted that he had never attempted to follow Ladish's procedure governing transfers. I am persuaded that the company intended to and did discourage him from attempting to transfer into the Blacksmiths' Union and that the Union acquiesced in this.

41. Wardell Wilson was hired into the Machinists' bargaining unit on January 30, 1956. He had a locker close to where a number of blacksmiths dressed. At trial, Wilson testified that he had talked with Ray Nauman, a blacksmith, about the way in which he could obtain a job under the Blacksmiths' bargaining unit. Nauman replied that blacks would not be allowed into a job within the Blacksmiths' bargaining unit.

42. On cross-examination, Wilson admitted that he never had formally attempted to transfer from his job in the Machinists' bargaining unit to a job within the Blacksmiths' bargaining unit.

43. William Wattleton testified that while he was working as an inspector in the forge department, a job under the jurisdiction of the Machinists, he had inquired about the way in which he could transfer to a job under the jurisdiction of the Blacksmiths. He was told by a member of the Blacksmiths' bargaining unit that blacks would not be allowed into a job within the Blacksmiths' bargaining unit.

44. On cross-examination, Wattleton admitted that he never had formally attempted to transfer from his job as inspector in the Machinists' bargaining unit to a job within the Blacksmiths' bargaining unit.

45. Frank Seng, chairman of the Blacksmiths' bargaining committee and Ladish employee since 1950, testified that many of the blacksmiths had come to Milwaukee from the South and had not shared his views and feelings of no prejudice against blacks.

46. Having considered all the evidence, including (1) the statistical evidence relating to transfers of employees during the period 1948 to 1968, (2) the total lack of evidence showing that blacks hired during the period 1948 to 1968 were less skilled, less qualified, or less apt to learn job skills as nonblacks hired during this same period of time, and (3) the testimony of the plaintiffs regarding their efforts to transfer to a job under the jurisdiction of the Blacksmiths, the Court concludes and so finds that blacks hired at Ladish during the period 1948 to 1968 were virtually limited to jobs under the jurisdiction of the Machinists as a matter of policy or practice by Ladish. This policy or practice is neither supported by the relative qualifications of black and white employees nor explained by any other business reason. The fact is that for a twenty-year period of time blacks were not allowed into jobs under the jurisdiction of

other bargaining units, and the evidence is overwhelming that this policy or practice of discriminatory transfer by Ladish was intentional.

47. The Blacksmiths contend that the plaintiffs have failed to establish the involvement of a single official of the Blacksmiths in decisions not to transfer the plaintiffs into jobs within their bargaining unit. In support of their contention, the Blacksmiths argued that the right to transfer employees has been and is the sole responsibility and exclusive right of Ladish and that, in any event, not a single plaintiff had followed Ladish's procedure governing transfers. For reasons that the Court will shortly offer, the Court rejects the Blacksmiths' contention.

48. The uncontroverted evidence is that between 1949 and January 27, 1955, Ladish allowed a number of nonblacks to transfer from jobs under the jurisdiction of the Machinists to jobs under the jurisdiction of the Blacksmiths; while the uncontroverted evidence is also that the Ladish-Blacksmiths' collective bargaining agreement, effective August 22, 1949 to September 30, 1951, and thereafter, gave the Blacksmiths virtual veto power over inter-bargaining unit transfers, i. e., over transfers from another bargaining unit into jobs under the jurisdiction of the Blacksmiths.

49. After both judging the credibility of Leflore, Wilson, Wattleton, and Banks and reviewing the record, the Court is convinced that no plaintiff transferred to a job under the jurisdiction of the Blacksmiths for reasons that the Blacksmiths made it clear to Ladish and also made it clear to the plaintiffs that they did not want and would not accept blacks into their bargaining unit. Such a determination is, by its nature, subjective; but determining whether invidious discriminatory purpose was a motivating factor requires a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. See *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

F. *Whether the Challenged Seniority Systems Freeze the Status Quo of Prior Discriminatory Practices and Carry That Discrimination Into the Present*

50. The OFCC determination, the testimony of the plaintiffs, and the operation of the challenged seniority systems are persuasive evidence that the seniority systems embodied in the collective bargaining agreements between Ladish and the three defendant bargaining units have perpetuated the effects of prior discriminatory practices and will carry the effects of that discrimination into the present.

G. *Whether Having the Challenged Seniority Systems in Separate Bargaining Units is Rational and in Conformance with Industry Practice and The National Labor Relations Act*

At trial, the Court heard testimony from Professor Herbert Hill, John Foley, Richard Junas, and Joseph George on the issue of whether the challenged seniority systems were rational and in conformance with industry practice and the National Labor Relations Act.

51. Foley testified that on at least three or four occasions the Machinists had attempted to eliminate their internal departmental seniority system. Ladish, however, rejected these attempts because in its opinion departmental seniority is beneficial and advantageous to the smooth operation of Ladish's manufacturing processes. Foley and Junas testified that in the event all bargaining units had proposed full carryover seniority for all purposes for all bargaining unit members in response to OFCC's 1973–1974 proposal regarding relief for the affected class, Ladish would have rejected this proposal because in its opinion full carryover seniority is dysfunctional and disruptive to the smooth operation of Ladish's manufacturing processes.

52. Based on the testimony of Foley and Junas, the Court finds that the Machinists' internal departmental seniority is rational, and further finds that the prohibition of carryover seniority between multiple bargaining units in a single plant is rational.

53. Professor Hill and George testified concerning their considerable knowledge of seniority systems, and George testified concerning his considerable experience in the negotiation of collective bargaining agreements. Having considered their testimony, the Court finds that the prohibition of carryover seniority between multiple bargaining units in a single plant, which is the situation at Ladish, is both nearly a universal industry practice and consistent with National Labor Relations Board precedents. The Court also finds that the Machinists' internal departmental seniority system is in accordance with widespread industry practice.

54. As noted above, Professor Hill testified extensively on the history of the International Association of Machinists and Aerospace Workers. He compared the Machinists' unit at Ladish with the International Association of Machinists and Aerospace Workers, noting that the Machinists' bargaining unit at Ladish is both an industrial and craft bargaining unit while the International union has traditionally been a craft union. The Court is not persuaded and does not find that this comparison shows that industrial jobs were added to the Machinists' bargaining unit in order to keep blacks in jobs under the jurisdiction of the Machinists. Instead, the Court finds that the addition of industrial jobs to those jobs already under the jurisdiction of the Machinists was rational and completely in accordance with National Labor Relations Board precedents.

H. *Whether the Seniority Systems of the Machinists, Blacksmiths, or Die Sinkers Had Their Genesis in Racial Discrimination*

Since other courts have scrutinized the events leading up to the challenged seniority practices, including but not limited to the past and contemporaneous actions of relevant institutions, see, e. g., *James v. Stockham Valves and Fittings Co.,* 559 F.2d 310, 352 (5th Cir. 1977); *Scarlett v. Seaboard Coastline R.R. Co.,* 21 E.P.D. ¶ 7678, at 12,-728 (S.D.Ga.1979), the Court listened with interest to a long history of racial discrimination within the International Association of Machinists and Aerospace Workers and the International Brotherhood of Boilermakers, Ironship Builders, Blacksmiths, Forgers, and Helpers of America.

55. Based on the extensive research and uncontroverted testimony of the plaintiffs' expert, Professor Herbert Hill, the Court is persuaded and so finds (1) that the International Association of Machinists and Aerospace Workers had a long history of policies and practices which resulted in the exclusion of blacks from membership in the International union until approximately 1948; (2) that the International Brotherhood of Boilermakers, Ironship Builders, Blacksmiths, Forgers, and Helpers of America had a long history of policies and practices which resulted first in the exclusion of blacks from membership in the International union and later in the segregation of blacks into black auxiliaries until approximately 1947; and (3) that there is no evidence that the International Die Sinkers Conference had policies or practices of racial discrimination.

56. Based on a thorough and careful consideration of the entire record, the Court finds that the plaintiffs failed to produce any evidence that either the Machinists or the Blacksmiths, the local auxiliary unions that are defendants to this action, followed or maintained discriminatory policies or practices similar to those of the International unions.

57. Between 1927 and approximately 1943, there were no collective bargaining units representing employees at Ladish.

58. The first collective bargaining agreement at Ladish was a collective bargaining agreement between Ladish and the Die Sinkers. This original agreement, effective from April 21, 1943, included a seniority system which provided, inter alia, for bargaining unit seniority,[6] classification

---

**6.** Bargaining unit seniority prevents employees from transferring to a job under the jurisdiction of another bargaining unit with full carryover seniority for all purposes. For example, as the Die Sinkers' seniority system operated and still operates, if a Machinist transferred to a job under the jurisdiction of the Die Sinkers, he would exercise departmental (date of entry into

seniority, and for work sharing down to twenty-four hours per week before layoffs would begin.

59. The first collective bargaining agreement between Ladish and the Machinists was effective from June 6, 1945 to May 31, 1946. This original agreement included a seniority system which provided, inter alia, for bargaining unit seniority and departmental seniority. The agreement further provided that an employee leaving the Machinists' bargaining unit would immediately lose all his accrued seniority within the Machinists' bargaining unit upon transfer to a job under the jurisdiction of another bargaining unit, even if that employee would later return to a job within the Machinists' bargaining unit.

60. As recited above, the original Ladish-Machinists' collective bargaining agreement provided for departmental seniority. That is, if an employee in one department in the Machinists' bargaining unit transferred to another department in the Machinists' bargaining unit, then for a one-year period that employee would forfeit his accrued bargaining unit seniority for purposes of layoff, recall, and job bidding.[7]

61. The first collective bargaining agreement between Ladish and the Blacksmiths was effective from March 23, 1945 to August 31, 1946. This original labor contract included a seniority system which provided, inter alia, for bargaining unit and departmental seniority. In particular, employees who moved either from a job under the jurisdiction of another bargaining unit to a job under the jurisdiction of the Blacksmiths or from a job in one department of the Blacksmiths to a job in another department of the Blacksmiths forfeited their seniority for purposes of layoff, recall, and job bidding.

62. Based on the facts that the first Ladish-Die Sinkers' collective bargaining agreement was effective from April 21, 1943, and that the first blacks were apparently hired at Ladish in 1948, the Court is persuaded and so finds that the challenged seniority system in the Ladish-Die Sinkers' collective bargaining agreement did not have its genesis in racial discrimination.

63. Based on the facts that the first Ladish-Machinists' collective bargaining agreement was effective from June 6, 1945 to May 31, 1946, and that the first blacks were apparently hired at Ladish in 1948, the Court finds that the challenged seniority system in the Ladish-Machinists' collective bargaining agreement did not have its genesis in racial discrimination.

64. Based on the facts that the first Ladish-Blacksmiths' collective bargaining agreement was effective from March 23, 1945 to August 31, 1946, and that the first blacks were apparently hired at Ladish in 1948, the Court finds that the challenged seniority system in this particular Ladish-Blacksmiths' collective bargaining agreement did not have its genesis in racial discrimination.

I. *Whether the Challenged Seniority Systems Have Been Negotiated and Maintained Free From Any Illegal Purpose*

65. The Die Sinkers' seniority provisions have been carried forward, essentially unchanged, through every collective bargaining agreement between Ladish and the Die Sinkers to the present.

66. The present Machinists' seniority provisions differ somewhat from those contained in the original Ladish-Machinists' collective bargaining agreement. The current Ladish-Machinists' agreement does not

the Die Sinkers' bargaining unit) seniority for purposes of layoff, recall, and job bidding and plantwide (date of entry into Ladish workforce) seniority for purposes of fringe benefits.

**7.** For example, if a Machinist transferred from Machinist Department A ("A") into Machinist Department B ("B"), then for one year after the date of his transfer into B he would not be able

to exercise his bargaining unit seniority accrued in A for purposes of layoff, recall, and job bidding in B. After working for one year in B, he would recoup his bargaining unit seniority accrued in A, which recoupment would be added to his bargaining unit seniority accrued in B for purposes of layoff, recall, and job bidding in B.

contain the one-year waiting period for recoupment of accrued seniority upon transfer to a new department within the Machinists' bargaining unit and does contain a clause that allows an employee leaving the Machinists' bargaining unit and taking a job under the jurisdiction of another bargaining unit the opportunity to return to the Machinists' bargaining unit within ninety days without loss of all his accrued seniority within the Machinists' bargaining unit. The Machinists' departmental seniority provisions and seniority provisions which prevent employees in other bargaining units from transferring to a job under the jurisdiction of the Machinists with full carryover seniority for all purposes have been carried forward, essentially unchanged, through every collective bargaining agreement between Ladish and the Machinists to the present.

67. The present Blacksmiths' seniority provisions are essentially the same as those contained in the original Ladish-Blacksmiths' collective bargaining agreement. These seniority provisions, however, have not been carried forward unchanged through every collective bargaining agreement between Ladish and the Blacksmiths to the present. Bargaining unit seniority was carried forward through two more collective bargaining agreements between Ladish and the Blacksmiths. In the Ladish-Blacksmiths' collective bargaining agreement, effective August 22, 1949 to September 30, 1951, however, a significant change was made to the bargaining unit seniority provisions of the Ladish-Blacksmiths' labor contract; it was changed such that total plantwide seniority would carry over to jobs under the jurisdiction of the Blacksmiths for purposes of layoff. Specifically, employees who transferred to jobs under the jurisdiction of the Blacksmiths carried with them whatever seniority they had previously accrued for purposes of layoff and recall. This change, allowing carryover seniority, remained in effect from August 22, 1949 to January 27, 1955, as will be noted below. In the Ladish-Blacksmiths' collective bargaining agreement effective September 20, 1954 to September 24, 1956, the provision that total plantwide seniority would carry

over to jobs under the jurisdiction of the Blacksmiths was deleted. Despite this deletion, those persons who had transferred from August 22, 1949 to January 27, 1955, to a job under the jurisdiction of the Blacksmiths were still allowed to utilize their total plantwide seniority for layoff and recall purposes. In 1972, the Ladish-Blacksmiths' collective bargaining agreement was amended to clearly set forth the special seniority rights of those individuals who had transferred to jobs under the jurisdiction of the Blacksmiths between 1949 and January 27, 1955.

68. The original Ladish-Blacksmiths' collective bargaining agreement has been subject to other changes. The original Ladish-Blacksmiths' collective bargaining agreement, effective March 23, 1945 to August 31, 1946, contained a nondiscrimination clause which read as follows:

"Neither the Company nor the Union shall discriminate against any employee because of his membership or nonmembership in the Union, or his race, color, creed, or national origin." (Article I, ¶ 4.)

Identical language was carried forward through two more collective bargaining agreements between Ladish and the Blacksmiths. In the Ladish-Blacksmiths' collective bargaining agreement effective August 22, 1949 to September 30, 1951, the clause prohibiting discrimination on the basis of race, color, creed, or national origin was eliminated. A nondiscrimination clause in the Ladish-Blacksmiths' collective bargaining agreement was not again added until after the passage of Title VII in 1964.

69. The original collective bargaining agreement between Ladish and the Blacksmiths, effective from March 23, 1945 to August 31, 1946, and the next two collective bargaining agreements thereafter contained no provisions regarding inter-bargaining unit transfers. In the Ladish-Blacksmiths' collective bargaining agreement effective August 22, 1949 to September 30, 1951, a significant provision regarding inter-bargaining unit transfers was added:

"Permanent inter-bargaining unit transfers will be made by agreement between Management and the Bargaining Committee of the unit to which the employee is being transferred." (Article IV, Transfers and Layoffs, ¶ 8.)

Subsequent Ladish-Blacksmiths' collective bargaining agreements retained this inter-bargaining unit transfer provision, including the Ladish-Blacksmiths' agreement effective January 1, 1951 to June 30, 1952; the Ladish-Blacksmiths' agreement effective September 1952 to September 1954; the Ladish-Blacksmiths' agreement effective September 20, 1954 to September 24, 1958; the Ladish-Blacksmiths' agreement effective November 1955 to September 1958; and the Ladish-Blacksmiths' agreement effective 1958 to 1961.

70. A review of the history of collective bargaining agreements between Ladish and the Die Sinkers, Machinists, and Blacksmiths reveals that the challenged seniority systems provided, with one important exception, that employees who transferred from a job under the jurisdiction of one bargaining unit to a job under the jurisdiction of another bargaining unit had to forfeit their accrued seniority for purposes of layoff, recall, and job bidding.

71. The uncontroverted evidence is that:

(a) The exception to the general rule set forth above is the Ladish-Blacksmiths' collective bargaining agreements effective from August 22, 1949 to September 20, 1954. These collective bargaining agreements changed the seniority provisions governing the Blacksmiths' bargaining unit such that full plantwide seniority would prevail in jobs under the jurisdiction of the Blacksmiths for purposes of layoff and recall.

(b) The Ladish-Blacksmiths' collective bargaining agreement, effective August 22, 1949 to September 30, 1951, and thereafter, gave the Blacksmiths virtual veto power over interbargaining unit transfers. That is, in contrast to Ladish's sole responsibility and exclusive right to transfer employees into jobs under the jurisdiction of the Die Sinkers and the Machinists, Ladish's ability to transfer employees into jobs under the jurisdiction of the Blacksmiths was subject to the Blacksmiths' approval of the transfer.

(c) Ladish allowed, and the Blacksmiths permitted, a number of nonblack employees to transfer from jobs under the jurisdiction of the Machinists to jobs under the jurisdiction of the Blacksmiths between 1949 and January 27, 1955, with full carryover seniority for purposes of layoff and recall. In contrast, no black employees were afforded transfers to jobs under the jurisdiction of the Blacksmiths between 1949 and January 27, 1955.

(d) The Ladish-Blacksmiths' collective bargaining agreement, effective September 20, 1954 to September 24, 1956, deleted the provision permitting transferring employees to carry with them their full plantwide seniority for purposes of layoff and recall.

(e) The Ladish-Blacksmiths' collective bargaining agreement, effective August 22, 1949 to September 30, 1951, and for several collective bargaining agreements thereafter, eliminated the nondiscrimination provisions of earlier Ladish-Blacksmiths' collective bargaining agreements.

72. At trial, both Professor Hill and Joseph George testified concerning their knowledge of seniority systems in the Milwaukee area and throughout the United States. Aside from the Ladish-Blacksmiths' collective bargaining agreements, neither Hill nor George was aware of any other collective bargaining agreement in which the seniority system went from one of allowing the carryover of full plantwide seniority for purposes of layoff and recall to one of prohibiting the carryover of full plantwide seniority for such purposes.

73. The three changes in the Ladish-Blacksmiths' collective bargaining agreement, effective August 22, 1949 to September 30, 1951, coincided with the time Ladish first began to hire blacks in 1948. The change in the Ladish-Blacksmiths' collective bargaining agreement, effective September 20, 1954 to September 24, 1956, coincided with times of a steady increase in the hiring of blacks at Ladish. As noted above, between 1948 and 1968 Ladish hired 190

blacks who were still actively employed at Ladish as of 1974. While only 2 of these 190 were hired by Ladish in 1948 and none were hired in 1949, 3 blacks were hired in 1950, 24 blacks were hired in 1951, 12 blacks were hired in 1952, and 15 blacks were hired in 1953. While no blacks were hired in 1954, 26 blacks were hired in 1955 and 45 blacks were hired in 1956.

74. These changes in the Ladish-Blacksmiths' collective bargaining agreement, when considered in light of the evidence heard by the Court relating to individual blacksmith's feelings toward transfer of the plaintiffs into jobs under the jurisdiction of the Blacksmiths and the evidence showing that nonblacks were allowed to transfer with full carryover seniority to jobs under the jurisdiction of the Blacksmiths while during the same time period blacks were discouraged from doing so, are persuasive evidence that the Blacksmiths' seniority system has not been negotiated and maintained free from any illegal purpose. The Court specifically finds that the plaintiffs have come forward with sufficient credible evidence to support their claim that the challenged seniority system contained in the Ladish-Blacksmiths' collective bargaining agreement, inter alia, was negotiated and maintained with a purpose of preventing only blacks from entering into jobs under the jurisdiction of the Blacksmiths. The Court has considered, but has rejected, the Blacksmiths' contention that the sole purpose of the deletion of carryover seniority in the Ladish-Blacksmiths' collective bargaining agreement in 1954 was to reflect the fact that other bargaining units had failed to reciprocate by bargaining a similar system of carryover seniority.

75. There is simply no evidence in the record to support the theory that the Machinists', the Blacksmiths' or the Die Sinkers' collective bargaining agreements were negotiated pursuant to an agreement or conspiracy among the bargaining units that the Machinists take in all the blacks. Nor is there any evidence in the record to support the plaintiffs' contention that the Machinists', Blacksmiths', or Die Sinkers' refusal in 1974 to allow the members of the affected class to transfer from jobs under

the jurisdiction of the Machinists to jobs under their respective jurisdiction with full carryover seniority or refusal to modify their respective seniority system to allow carryover seniority was motivated by their animosity towards the plaintiffs.

76. Absent any evidence to the contrary, the Court finds that the plaintiffs have not established that the seniority system which existed in the collective bargaining agreements between Ladish and the Die Sinkers was maintained with a purpose and intent to discriminate against them.

77. Absent any evidence to the contrary, the Court finds that the plaintiffs have not established that the seniority system which existed in the collective bargaining agreements between Ladish and the Machinists was maintained with a purpose and intent to discriminate against them.

J. *Whether the Challenged Seniority Systems Operate to Discourage All Employees Equally from Transferring Between Seniority Units*

78. The plaintiffs did not contend at trial that the challenged seniority systems involved disparate treatment. Rather, the gist of their action was that the challenged seniority systems, although neutral on their face, have and were intended to have a disparate impact on black workers. Despite the plaintiffs' suggestion that the internal departmental seniority system of the Machinists is a failure to fairly represent the plaintiffs, the law is clear that an internal departmental seniority system is to be evaluated using the same criteria as used to evaluate multi-union seniority systems at a single plant. See *EEOC v. Chesapeake and Ohio Railway Co.*, 577 F.2d 229, (4th Cir. 1978); *Swint v. Pullman-Standard*, 624 F.2d 525 (5th Cir. 1980).

79. Based on the evidence, the Court finds that both the Machinists' internal departmental seniority system and their bargaining unit seniority system are facially neutral and that both systems operate to affect similarly situated (without regard to race) employees similarly. That is, to the extent the internal departmental seniority

system locks in or discourages employees from transferring, it does so for all employees; to the extent the bargaining unit seniority systems of other ·bargaining units lock in or discourage machinists from transferring, it does so for all machinists. And, to the extent the bargaining unit seniority system of the Machinists prohibits carryover seniority into its bargaining unit, it locks out or discourages equally all employees from transferring into the Machinists' bargaining unit.

80. Based on the evidence, the Court finds that the Die Sinkers' bargaining unit seniority system is facially neutral and operates to affect similarly situated (without regard to race) employees similarly. That is, to the extent the bargaining unit seniority systems of other bargaining units lock in or discourage die sinkers from transferring, it does so for all die sinkers; to the extent the bargaining unit seniority system of the Die Sinkers prohibits carryover seniority into its bargaining unit, it locks out or discourages equally all employees from transferring into the Die Sinkers' bargaining unit.

81. Consistent with the Court's findings of fact regarding whether the Ladish-Blacksmiths' collective bargaining agreements were negotiated and maintained free from a purpose of intentionally discriminating against blacks, the Court finds, based on the evidence, that the seniority systems negotiated between Ladish and the Blacksmiths have and were intended to have a disparate impact on black workers at Ladish.

K. *Whether the Machinists Bargaining Unit Has Failed to Properly and Fairly Represent Its Black Members*

82. The Court has found that on at least three or four occasions, the Machinists have attempted to eliminate their internal departmental seniority system, but that on each occasion their attempt was rebuffed by Ladish. See finding of fact number 51.

83. The Court has found that the Machinists have proposed full carryover seniority for all members of its bargaining unit in response to Ladish's proposal of full carry-over seniority for the OFCC-determined affected class. See finding of fact number 22.

84. The Machinists are restricted by law to negotiate with Ladish for seniority rights solely within the Machinists' bargaining unit. Subject to this legal restriction, the Machinists could not bargain with Ladish for a provision allowing its members full carryover seniority for all purposes upon transfer to a job under the jurisdiction of and subject to the seniority provisions of another bargaining unit.

85. At no time prior to the commencement of this action had there been any claim made by any of the plaintiffs that the Machinists did not properly or fairly represent its members.

86. Based on all the evidence adduced at trial, the Court finds that not one plaintiff stated that he was dissatisfied with· the Machinists' representation in the negotiation of wages, hours, or conditions of employment or in the prosecution of grievances. The Court further finds that not one plaintiff stated that he had not enjoyed full membership in the Machinists or had not had the opportunity to fully participate in the Machinists' membership meetings or activities. Finally, the Court finds that several of the plaintiffs have occupied and currently occupy positions of trust and authority within the Machinists' bargaining unit.

87. Based on the findings of fact enumerated above, the Court concludes that the plaintiffs have failed to show that the Machinists' bargaining unit has failed to properly and fairly represent its black members.

III. *CONCLUSIONS OF LAW*

1. A violation of either Title VII or 42 U.S.C. § 1981 requires an intentional discriminatory act; a disparate impact is not sufficient to establish such a violation. *Cannon v. The University of Chicago*, 648 F.2d 1104 at 1108 (7th Cir. 1981) (Title VII); *Mescal v. Burrus*, 603 F.2d 1266, 1270 (7th Cir. 1979) (§ 1981).

■ 2. The Court was convinced at trial and remains convinced that the plaintiffs have met their burden of establishing discriminatory hiring, placement, and transfer policies on the part of Ladish for the period 1948 to 1968, carried over past the effective date of Title VII through the operation of the challenged seniority systems. No reasonable trier of fact could find otherwise. Convinced that the plaintiffs have met their burden set forth above, the Court must next consider the issue of whether the challenged seniority systems are immunized by § 703(h) of Title VII.[8] See *Teamsters v. United States*, 431 U.S. 324, 352–353, 97 S.Ct. 1843, 1863, 52 L.Ed.2d 396 (1977). In consideration of this issue, the burden of demonstrating that the challenged seniority systems are bona fide is on the unions. See *Swint v. Pullman-Standard*, 17 E.P.D. ¶ 8604, at 7098 (N.D.Ala.1978), rev'd on other grounds, 624 F.2d 525 (5th Cir. 1980), cert. granted, —— U.S. ——, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981); *Griffin v. Copperweld Steel Co.*, 22 E.P.D. ¶ 30,637, at 14,413 (N.D.Ohio 1979); *Scarlett v. Seaboard Coastline R.R. Co.*, 21 E.P.D. ¶ 7,678, at 12,728 (S.D.Ga.1979); *Freeman v. Motor Convoy*, 20 E.P.D. ¶ 30,090, at 11,493 (N.D.Ga.1979); *Broadnax v. Mo. Pacific R.R. Co.*, 20 E.P.D. ¶ 30,132, at 11,708 (E.D. Ark.1978).

3. In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 353–354, 97 S.Ct. 1843, 1863–64, 52 L.Ed.2d 396 (1977), the Court considered § 703(h) and construed this section as providing "that an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." As emphasized by the Supreme Court, however:

" * * * § 703(h) does not immunize all seniority systems. It refers only to 'bona fide' systems, and a proviso requires that any differences in treatment not be 'the result of an intention to discriminate because of race * * *.' * * * " *Id.*, at 353.

See also *California Brewers Association v. Bryant*, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980).

■ In determining whether the challenged seniority systems are bona fide under the teaching of Teamsters, this Court is both guided by the Teamsters' decision and relies upon a distillation of factors set forth by several cases interpreting the Teamsters' decision. Those guiding factors are:

(a) Whether the seniority system operates to discourage all employees equally from transferring between seniority units;

(b) Whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);

(c) Whether the seniority system had its genesis in racial discrimination; and

(d) Whether the system was negotiated and has been maintained free from any illegal purpose. *James v. Stockham Valves and Fittings Co.*, 559 F.2d 310, 350–353 (5th Cir. 1977). See also *Sears v. Bennett*, 645 F.2d 1365, 1372 (10th Cir. 1981), *Swint v. Pullman-Standard*, 624 F.2d 525, 530 (5th Cir. 1980). The Court is mindful that these guiding factors are simply a mode of analysis for determining what is in reality the ultimate issue: whether "the totality of the circumstances" indicate that "there has been purposeful discrimination in connection with the establishment or continuation of a seniority system." *Swint*, supra, at 530; *James*, supra, at 351.

■ 4. Applying the above-stated authority to the facts found in this case, the Court was convinced at trial, and remains convinced, that as a matter of law the Ma-

---

**8.** Section 703(h) of Title VII, 42 U.S.C. § 2000e-2(h), provides in pertinent part:

"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority * * * system, * * * provided that such differences are not the result of an intention to discriminate because of race * * *."

chinists and Die Sinkers have met their burden of demonstrating that there has been no purposeful discrimination in connection with the establishment or continuation of their respective seniority systems. That is, the seniority systems of both the Machinists and the Die Sinkers are bona fide within the meaning of § 703(h) of Title VII.

■ Following the same application of authority to the facts found in this case, the Court was convinced at trial, and remains convinced, that as a matter of law the Blacksmiths have not met their burden of demonstrating that there has been no purposeful discrimination in connection with the establishment or continuation of their seniority system. No reasonable trier of fact, in the Court's opinion, could conclude otherwise.

In 1949, the Ladish-Blacksmiths' collective bargaining agreement was changed in three ways. First, the collective bargaining agreement was changed from one not allowing transfer to jobs under the jurisdiction of the Blacksmiths with full carryover seniority for purposes of layoff and recall to one allowing such transfers. Second, the collective bargaining agreement was changed from one not allowing the Blacksmiths virtual veto power with respect to any inter-bargaining unit transfers to one allowing such veto power. Third, the collective bargaining agreement was changed from one containing an antidiscrimination clause to one not containing such a clause. These three changes remained in effect from 1949 to January 27, 1955. The uncontroverted evidence is that from 1949 to 1955, a period of time during which blacks became a factor in the workforce at Ladish, a number of white employees in jobs under the jurisdiction of the Machinists transferred to jobs under the jurisdiction of the Blacksmiths, while no blacks were allowed to transfer to jobs under the jurisdiction of the Blacksmiths despite their attempts and desires to do so. In 1955, the Ladish-Blacksmiths' collective bargaining agreement

was changed to prohibit transfer to jobs under the jurisdiction of the Blacksmiths with full carryover seniority for purposes of layoff and recall. This change did not affect those nonblack employees who had transferred to jobs within the Blacksmiths' bargaining unit from 1949 to 1955. They retained the seniority they had previously carried with them into the Blacksmiths' bargaining unit and still exercise that seniority today. In the Court's opinion, these contractual changes negotiated by the Blacksmiths, when considered in conjunction with facts found respecting plaintiffs' testimony and with facts found regarding hiring, placement, and transfer policies on the part of Ladish, are persuasive evidence that the Blacksmiths' seniority system was not always negotiated and has not always been maintained free from a purpose, intent, and effect of discriminating against the plaintiffs. That is, the seniority system of the Blacksmiths' is not bona fide within the meaning of § 703(h) of Title VII.

5. Having found that the Blacksmiths' seniority system was not always negotiated and has not always been maintained free from a purpose, intent, and effect of discriminating against the plaintiffs, the Court concludes that the Blacksmiths' seniority system also constitutes a violation of 42 U.S.C. § 1981. *Mescall v. Burrus*, 603 F.2d 1266 (7th Cir. 1979).

■ 6. A union breaches its duty of fair representation only when its conduct towards a member or members is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). Based on the findings of fact set forth earlier in this opinion, the Court concludes as a matter of law that the plaintiffs have failed to produce any evidence showing that the Machinists' bargaining unit has failed to properly and fairly represent its black members.

■ 7. Having found a violation of Title VII with respect to the seniority system implemented by Ladish and the Black-

smiths, the Court concludes that all class members in this action should be granted an opportunity to transfer from their jobs within the jurisdiction of the Machinists to job vacancies within the jurisdiction of the Blacksmiths with full carryover seniority for all purposes. The Court has reviewed the terms of the consent decree previously entered between plaintiffs, Ladish, and four union defendants (not including the Blacksmiths). The Court determines that the seniority carryover relief established in the consent decree to which Ladish has already agreed would constitute reasonable and proper relief in this proceeding against the Blacksmiths. That is, those individuals who have indicated, pursuant to the consent decree, that they desire to transfer to jobs within the jurisdiction of the Blacksmiths shall be given an opportunity to do so as vacancies arise under the terms of the consent decree. This procedure will allow blacks to transfer from their present positions to jobs within the jurisdiction of the Blacksmiths with full carryover seniority to be exercised in the Blacksmiths' unit for all pertinent purposes and thereby obtain their "rightful place." *Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States*, 416 F.2d 980 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); *United States v. N. L. Industries, Inc.*, 479 F.2d 354 (8th Cir. 1973).

8. Plaintiffs are also entitled to monetary compensation for the loss they have suffered as a result of the discrimination of the defendant Blacksmiths. Class members will be entitled to back pay with appropriate interest and to front pay to compensate them for any monetary loss sustained as a result of discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The back pay period will begin December 30, 1969, the appropriate limitation period in Wisconsin under § 1981.

Rule 53(b) of the Federal Rules of Civil Procedure permits reference to a special master in cases tried to the court of "matters of account and of difficult computation of damages." The determination of the amount owing to each class member from the Blacksmiths is an appropriate subject for reference to a master. See *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir. 1975). Accordingly, such a reference will be made following the disposition of any appeal which may be taken from the judgment entered today. If the judgment is affirmed and the reference to a master is made, the judgment will be amended following the conclusion of proceedings before the master to reflect the exact amount owing under this decision and order to each class member. A copy of the proposed order of reference to a master is attached as an appendix to this document.

9. The Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988, declares that:

> " * * * In any action or proceeding to enforce a provision of sections 1981 * * *, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Although the Act on its face provides that the decision to award attorney's fees is a matter committed to the discretion of the Court, the Seventh Circuit has stated that " 'a prevailing plaintiff should receive fees [under the Act] almost as a matter of course.' " *Bond v. Stanton*, 630 F.2d 1231, 1233 (7th Cir. 1980), quoting from *Davis v. Murphy*, 587 F.2d 362, 364 (7th Cir. 1978).

Plaintiffs need not prevail on every issue to be awarded attorney's fees under § 1988. As stated by the Seventh Circuit:

> " * * * Indeed, such a requirement would 'stifle the presentation of innovative causes of action and would force courts to rule on every issue in a case, even if its rulings would be redundant.' *Ohland v. City of Montpelier*, 467 F.Supp. 324, 349 (D.Vt.1979). We note with ap-

proval the definition of prevailing party set forth by the First Circuit Court of Appeals in *Nadeau v. Helgemoe*, 581 F.2d 275, 278 (1st Cir. 1978): 'plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Busche v. Burkee*, 649 F.2d 509 at 521 (7th Cir. 1981).

Plaintiffs are prevailing parties for attorney's fees in this case with respect to the Blacksmiths. Plaintiffs are thus entitled to recover an amount of attorney's fees from the Blacksmiths based on work performed on the claims prepared and presented in which they were successful, *Busche v. Burkee*, supra, at 522; see also *Muscare v. Quinn*, 614 F.2d 577, 578–579 (7th Cir. 1980), as well as their costs.

The exact amount owing to the plaintiffs from the defendant Blacksmiths for attorney's fees, which are included in the judgment as an item of costs, will be determined at the conclusion of the proceedings before the special master, and the judgment will be amended accordingly to reflect the dollar figure.

10. In contrast to standards governing the award of attorney's fees to prevailing plaintiffs, a successful Title VII defendant can only recover attorney's fees when the Court finds that plaintiffs' claim was "frivolous, unreasonable, or without foundation." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). It is the Court's opinion that the plaintiffs' action is not so groundless as to justify a grant of attorney's fees to the Machinists or Die Sinkers. Indeed, the facts are that a number of defendants entered into a consent decree in this action which accorded to plaintiffs the very relief being sought here and that the plaintiffs prevailed against the Blacksmiths. Accordingly, neither the Machinists nor the Die Sinkers are entitled to recover an amount of attorney's fees against the plaintiffs. See generally *Nulf v. International Paper Co.*, 656 F.2d 553 (10th Cir., 1981).

## IV. *ORDER*

IT IS THEREFORE ORDERED that judgment be entered consistent with the foregoing findings of fact and conclusions of law.

## EXHIBIT A

### LADISH CO. CUDAHY HOURLY EMPLOYEES HIRED 8/16/48–12/31/67: DISTRIBUTION BY INITIAL BARGAINING UNIT

| YEAR | TOTAL PLACEMENTS | IAMAW | BLKS | IDSC | IBEW | IBFO | IFPTE | OPEIU | NON-AFFL. | NON-AFFILIATED MET BLKS. | NON-AFFILIATED IFPTE | INCLUDES OPEIU SHOP | INCLUDES OPEIU OFC. | IAMAW INCLUDES IBFO | IAMAW INCLUDES IBEW |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/16/48–12/31/48 | 89 | 41 | 41 | 1 | – | – | – | – | 6 | x | x | x | x | x | x |
| 1949 | 19 | 8 | 3 | 2 | – | – | – | – | 6 | x | x | x | x | x | |
| 1950 | 226 | 128 | 62 | 7 | – | – | – | – | 29 | x | x | x | x | x | x |
| 1951 | 312 | 196 | 60 | 7 | – | – | – | 19 | 30 | x | x | | x | x | x |
| 1952 | 86 | 57 | 15 | – | 1 | – | – | 8 | 5 | x | x | | x | x | |
| 1953 | 153 | 91 | 22 | 13 | 4 | – | – | 6 | 27 | x | x | | x | x | |
| 1954 | 72 | 44 | 2 | 6 | 2 | 1 | – | 1 | 17 | x | x | | x | x | |
| 1955 | 201 | 95 | 45 | 6 | 4 | – | – | 4 | 46 | x | x | | x | | |
| 1956 | 266 | 162 | 12 | 16 | 6 | – | – | 12 | 58 | x | x | | x | | |
| 1957 | 97 | 49 | – | 10 | 2 | – | – | 13 | 23 | x | x | | x | | |
| 1958 | 24 | 2 | – | 15 | – | – | – | – | 7 | x | x | | x | | |
| 1959 | 14 | 2 | – | 3 | – | – | – | 1 | 8 | x | x | | x | | |
| 1960 | 48 | 16 | – | 1 | – | – | 13 | 1 | 17 | x | x | | x | | |
| 1961 | 79 | 46 | – | 1 | – | 1 | 19 | 3 | 9 | x | | | x | | |
| 1962 | 48 | 19 | – | – | 2 | – | 4 | 5 | 18 | x | | | x | | |
| 1963 | 22 | 12 | – | 1 | – | – | 3 | 1 | 5 | | | | x | | |
| 1964 | 33 | 13 | 7 | – | – | – | 7 | 6 | – | | | | | | |
| 1965 | 198 | 110 | 41 | 12 | 4 | – | 16 | 15 | – | | | | | | |
| 1966 | 255 | 107 | 57 | 10 | 4 | – | 38 | 39 | – | | | | | | |
| 1967 | 123 | 66 | 8 | 8 | 1 | 2 | 18 | 20 | – | | | | | | |
| TOTAL | 2,375 | 1,264 | 375 | 119 | 30 | 4 | 118 | 154 | 311 | | | | | | |

EXHIBIT B

LADISH CO. CUDAHY MINORITY HOURLY EMPLOYEES HIRED 8/16/48–12/31/67: DISTRIBUTION BY INITIAL BARGAINING UNIT

| Year | Black | IAMAW Orient. | IAMAW Am. Ind. | IAMAW Span. | BLKS. Am. Ind. | BLKS. Span. | IFPTE Orient. | IFPTE Span. | IDSC Span. | OPEIU Orient. | OPEIU Am. Ind. | OPEIU Span. | NON-AFFL. Am. Ind. | NON-AFFL. Span. | IBEW | IBFO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1948 | 2 | 1 | | 1 | 2 | 4 | | | | | | | | | | |
| 1949 | | | 1 | | | | | | | | | | | | | |
| 1950 | 3 | | 1 | 2 | 1 | 2 | | | | | | | | 1 | | |
| 1951 | 24 | | | 3 | | 3 | | | | | | | | | | |
| 1952 | 12 | | | 2 | | 1 | | | | | | | | | | |
| 1953 | 15 | | | | | 1 | | | | | | | | | | |
| 1954 | | | | 1 | 1 | 1 | | | | | | | | | | |
| 1955 | 26 | | | 4 | | | | | 1 | | | | 1 | 1 | | |
| 1956 | 45 | 1 | | 2 | | | | | | | | | | | | |
| 1957 | 7 | | | 4 | | | | | | | | | | | | |
| 1958 | | | | | | | | | | | | | | | | |
| 1959 | | | | | | | | 1 | | | | | | | | |
| 1960 | | | | | | | | | | | | | | | | |
| 1961 | 2 | | | | | | | | | | | | | | | |
| 1962 | | | | | | | | | | | | | | | | |
| 1963 | 1 | | | 1 | | | 1 | | | | | | | 1 | | |
| 1964 | | | | 1 | | | | 1 | | | | | | | | |
| 1965 | 19 | | | 3 | | | | | | 1 | 1 | 1 | | | | |
| 1966 | 20 | | 2 | 5 | | | | | | | 1 | | | | | |
| 1967 | 14 | | | 7 | | | | | | | | | | | | |
| TOTAL | 190 | 2 | 4 | 37 | 4 | 12 | 1 | 2 | 1 | 1 | 2 | 1 | 1 | 3 | 0 | 0 |

## PROPOSED ORDER OF REFERENCE TO A MASTER

The Court hereby refers the above-entitled action to a Master, designated herein, for hearings, findings, and recommendations concerning the monetary relief to be awarded to the plaintiffs and class members pursuant to the findings of fact, conclusions of law and order and the separate judgment entered herein.

1. Pursuant to Rule 53 of the Federal Rules of Civil Procedure, _____ is hereby appointed as Master to make findings and recommendations for the back pay and front pay to be awarded to the plaintiffs and the class is directed by the judgment and this order.

2. The Master shall schedule and conduct hearings as necessary in order to make recommendations as provided herein. He shall file his findings and recommendations within 120 days from the date of the completion of all evidentiary hearings. Counsel for the parties will be notified by the Master of the dates, times, and location of the hearings to be held before the Master.

3. Within thirty (30) days of the date of this order, counsel for the plaintiffs are directed to mail to each of the plaintiffs and class members at their last known address copies of the attached "Notice of Back Pay Hearings" and "Claim Form" by certified mail. Plaintiffs and class members shall be given thirty (30) days from the date of said mailing to file their claim forms with the Clerk of Court. The expenses for this certified mailing shall be paid by the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local 1509 (hereinafter "Blacksmiths"), and plaintiffs' counsel shall be reimbursed for said expenses within ten (10) days of receipt of a bill therefor. Copies of the "Notice of Back Pay Hearings" shall also be posted on bulletin boards maintained by the Ladish Company at its Cudahy, Wisconsin, facilities.

4. Within thirty (30) days of the date by which claim forms must be filed, plaintiffs shall prepare a list of those individuals who have timely filed their claim forms. Blacksmiths shall be given an opportunity to review such list, and any controversy about whether a claim form has been timely filed, or whether a late claim should in equity be allowed, will be decided by the Master.

5. Following the preparation of the list of claimants as discussed above, the parties shall be allowed to conduct discovery with respect to the individual claims pursuant to Rules 26–37 of the Federal Rules of Civil Procedure. The Master shall hold such conferences with the parties as are necessary to schedule the time for the completion of the discovery and to calendar the back pay hearing. Upon the completion of discovery, the hearings will begin pursuant to the schedule promulgated by the Master.

6. The Master will receive evidence and make findings with respect to each claimant who contends he was denied an opportunity to transfer to a job under the jurisdiction of the Blacksmiths with full carryover seniority or who was discouraged from transferring to such a job because of the restrictive seniority found unlawful in this case. In his recommendation, the Master shall make specific findings with respect to any relevant background facts not already decided by the Court and all individual claims presented.

7. In making his recommendation with respect to the claims of individual claimants, the Master shall apply the following burdens to the parties:

(a) Each individual class member bears the initial burden of demonstrating (1) that he is black, (2) that he would have been interested in transferring to a job under the jurisdiction of Blacksmiths during the statute of limitations period if he could have so transferred with his full carryover seniority for all purposes, and (3) that an entry level job vacancy existed in a job under the jurisdiction of Blacksmiths during the statute of limitations period and at a time when he would have been interested in transferring with full carryover seniority. The class

member also will be required, if requested to do so, to provide a statement of his income during the pertinent back pay period.

(b) Once a claimant carries the initial burden set forth above, he will be presumptively entitled to an award of back pay. At that point, Blacksmiths will bear the burden of demonstrating by any competent evidence that the pertinent claimant would not have transferred to a job under the jurisdiction of Blacksmiths if he had been able to do so with full carryover seniority; that the claimant was, for any reason, not available for work during all or a portion of the back pay period he claims; or that the claimant would not or could not have performed any available job under the jurisdiction of the Blacksmiths. The above list of defenses is not exhaustive, and Blacksmiths should be granted an opportunity to present any other legitimate defenses it advances with respect to each individual claim.

(c) Once Blacksmiths offers its defenses to each claim, the pertinent claimant should be given an opportunity in rebuttal to demonstrate that whatever explanation or evidence is offered by Blacksmiths does not justify a finding that he would not have transferred to a job under the jurisdiction of Blacksmiths if he could have done so with full carryover seniority and that he indeed is entitled to an award of back pay.

In resolving each individual claim, the Master is instructed, as much as possible, to follow the step by step application of the burden of proof set forth above. The task of the Master is to decide whether each claimant who seeks monetary compensation would have transferred to a job under the jurisdiction of Blacksmiths within the statute of limitations. If the Master concludes a claimant would have so transferred if provided full carryover seniority for all purposes, said claimant is entitled to recover.

8. The Master is free and encouraged to hold consolidated hearings on related claims. Furthermore, the Master is not required to rehear the same evidence in more than one of the claims. When evidence is addressed to essential elements of more than one of the individual claims, facts (such as job vacancies) established with respect to one claimant may be taken by the Master as established without further proof with respect to all other claimants whose claims depend in whole or in part on proof of that same element.

9. The statute of limitations in this case for the purpose of monetary compensation is December 30, 1969, and the Master is directed to utilize that date in making his recommendations. No back pay can be awarded for any time prior to December 30, 1969.

10. With respect to those claimants who demonstrate that they have been victims of discrimination as set forth above, the Master shall calculate their back pay. In making the pertinent back pay calculations, the Master shall calculate the differences between what the claimant could have earned, including special compensation such as overtime, vacation pay, and the value of any fringe benefits which would have been available to claimant, and what the claimant did earn. The Master should render this factual decision according to the evidence introduced in each case. For example, some class members may have had previous experience which would indicate which job under the jurisdiction of Blacksmiths they could have performed. Another possible method of back pay calculation would be to compare a claimant (utilizing the claimant's hire date seniority) with an incumbent member of Blacksmiths with a similar hire seniority date. That is, the earnings of the incumbent member of Blacksmiths hired at about the same time as the pertinent claimant could be compared with the earnings of the claimant, and the claimant would receive the difference. The Master is free to use other methods of calculating the back pay due to individual class members in accordance with the evidence, law, and fairness. All calculations should be made utilizing each claim-

ant's hire date seniority. In making decisions with respect to the amount of back pay to be paid to an individual claimant, the Master should be mindful that unreasonable exactitude should not be required of claimants. The method of calculation should be designed to make each claimant "whole" and to provide to him the earnings he would have received if he had been able to exercise his full carryover seniority in the pertinent Blacksmiths' job.

In making his findings with respect to back pay owed to individual claimants, the Master shall make specific findings with respect to each individual claimant as to when the back pay owed should begin and when the back pay of said claimant should end. The Master is instructed to set forth his rationale and findings for each back pay decision made.

11. The Master shall add interest from the date back pay accrues (but no earlier than December 30, 1969) until the date it is paid to each monetary award at the "adjusted prime rate" used by the Internal Revenue Service and adopted by the National Labor Relations Board. Said interest shall be compounded monthly.

12. Where the Master finds (1) that an individual claimant is entitled to back pay, (2) that said individual claimant still desires an opportunity to transfer to a job under the jurisdiction of Blacksmiths with full carryover seniority, (3) that said individual claimant indicated pursuant to paragraph IV of the consent decree filed in this case on March 27, 1981, that he desired at that time to transfer to a job under the jurisdiction of Blacksmiths with full carryover seniority, and (4) that said individual claimant has not yet been given an opportunity to so transfer, such claimant shall be entitled to an award of front pay with interest as set forth above until such time as he is given an opportunity to transfer to a position under the jurisdiction of Blacksmiths pursuant to the terms of the judgment. The amount of front pay shall be calculated pursuant to applicable law and in a manner similar to that which is utilized for the calculation of back pay as set forth above.

13. The following are general rules which should govern the Master's determination:

(a) Facts found and conclusions of law reached by the Court will be accepted by the Master and will not be relitigated.

(b) In determining the individual claims as discussed herein, the Master shall follow applicable law and shall set forth in his recommendations the legal principles upon which he relies.

(c) The Master may require any party to this lawsuit to submit such additional data or information as may be necessary or helpful for the Master's determination.

(d) This order does not preclude agreement otherwise reached between the parties or settlement of any claims.

(e) The Federal Rules of Civil Procedure and Evidence shall govern proceedings before the Master. The Master may hold such other hearings and issue such other orders as may be appropriate for the orderly and efficient performance of his duties and are not inconsistent with prior orders of this Court or controlling case law.

14. The Master shall be compensated by the Blacksmiths at the rate of $_____ per hour, and shall also be reimbursed for any costs which he incurs in the performance of his duties.

15. Any order, decision, or recommendation of the Master shall be appealable to this court. However, proceedings before the Master shall not be stayed except by order of the Master or by order of this court. Application by a party for action by the court does not stay proceedings before the Master.

### NOTICE OF BACK PAY HEARINGS

TO: All blacks hired by the Ladish Company prior to January 22, 1968, who (1) were hired by the Ladish Company for jobs that were within the jurisdiction

of the International Association of Machinists and Aerospace Workers, Local 1862, and (2) were employed by the Ladish Company as of December 30, 1969.

PLEASE READ CAREFULLY.

THIS NOTICE CONCERNS YOUR RIGHTS IN THIS CASE.

The purpose of this notice is to describe the back pay hearings to be held in the above-captioned case and to tell you what you must do to participate in the back pay hearings.

On December 29, 1975, the plaintiffs filed this action against the Ladish Company and seven union defendants, alleging that the defendants discriminated against black employees at Ladish's Cudahy, Wisconsin, facilities with respect to various terms and conditions of employment. Plaintiffs alleged that the defendants' practices violated Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.

On March 27, 1981, a consent decree was entered in this case settling the controversy between plaintiffs, Ladish Company, and four of the unions. On ——————, findings of fact, conclusions of law and order and a judgment were filed in this case finding that one defendant union, the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers, Local 1509 (hereinafter "Blacksmiths") had violated laws prohibiting discrimination in employment.

The Court has ruled that all blacks who were both (1) hired initially by Ladish Company into a job within the jurisdiction of Local 1862, International Association of Machinists and Aerospace Workers, and (2) were actively working for Ladish Company as of December 30, 1969, may present claims for back pay to a Master appointed by the Court to conduct back pay hearings.

In order for you to prevail in this case and for you to receive back pay, you must demonstrate that you would have transferred to a job within the jurisdiction of Black-

smiths if you could have done so with full carryover seniority; that is, if you could have transferred with all of your seniority to be used for job bids, layoff, recall, and other purposes.

These back pay hearings are the only way for you to obtain back pay in this case. If you do not participate in these hearings, you will forfeit any chance to get back pay. (You have already received some money as a result of the consent decree. That payment will not be jeopardized by the back pay hearings.)

If you wish to pursue your claim for back pay, you should complete and file the attached "Claim Form" with the Clerk of Court whose name, address, and telephone number are:

Sofron B. Nedilsky

Clerk of Court

United States District Court

362 Federal Building

Milwaukee, Wisconsin 53202

Telephone: (414) 291–3798

In order for you to participate in the back pay hearings, <u>YOUR CLAIM FORM MUST BE FILED BY</u> ——————.

If you decide that you desire to participate in the back pay hearings, you should advise either of plaintiffs' counsel who are:

Percy L. Julian, Jr.

Julian & Olson, S.C.

330 East Wilson Street

P. O. Box 2206

Madison, Wisconsin 53701

Telephone: (608) 255–6400

and

Jonathan Wallas

Chambers, Ferguson, Watt, Wallas, Adkins & Fuller, P.A.

730 East Independence Plaza

951 South Independence Boulevard

Charlotte, North Carolina 28202

Telephone: (704) 375–8461

**1358**

You may also employ counsel of your choosing. If you elect to be represented by other counsel, you should have your counsel notify the Clerk of this Court, Sofron B. Nedilsky, at the address hereinbefore listed and file a notice of appearance on your behalf. Your counsel will then be provided with copies of all future pleadings and orders in this matter and with a schedule of the Master's hearings.

You MUST file the attached "Claim Form" with the Clerk of Court and contact plaintiffs' counsel or have counsel of your own choosing file a notice of appearance on your behalf on or before _____. If you fail to do so, you will lose whatever rights you may have to individual relief in this proceeding.

If you have any questions, you may contact plaintiffs' counsel at the above addresses and telephone numbers.

### CLAIM FORM

IN ORDER TO FILE A CLAIM IN THIS ACTION, YOU MUST FILE THIS FORM BY _____, 1981, OR YOU WILL LOSE YOUR RIGHT TO SEEK INDIVIDUAL RELIEF IN THIS CASE.

I am black. I desire to file a claim for back pay in the above-captioned case. I hereby state that the answers set forth below are true and correct.

### PLEASE TYPE OR PRINT

1. Name: _____
2. Social Security number: _____
3. Current home address: _____
   _____
   _____
4. Current home telephone number: (   )
5. Date you began employment with Ladish Co.: _____
6. First job with Ladish Co.: _____
   _____
7. Current employer: _____

8. Current job position: _____
   _____

9. I would have been interested in transferring into the following jobs or departments within the jurisdiction of the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, Local 1509, at some time between December 30, 1969 and December 29, 1975, if I could have transferred with all of my seniority: _____
   _____
   _____

   _____
   Claimant (Sign Your Name Here)

### IMPORTANT

Please note that all Claim Forms must be filed with Sofron B. Nedilsky, Clerk of the United States District Court for the Eastern District of Wisconsin, Federal Building, Room 362, Milwaukee, Wisconsin, on or before _____, 1981, or mailed to the office of the Clerk of Court, United States District Court, 362 Federal Building, Milwaukee, Wisconsin 53202, and postmarked before that date.

IF YOUR STATEMENT OF CLAIM IS NOT FILED AS DIRECTED ABOVE, IT WILL BE DISMISSED AND WILL NOT BE PROSECUTED FURTHER AND YOU WILL LOSE ALL RIGHTS IN THIS CASE.