William WATTLETON, et al.,
Plaintiffs-Appellees,

and

Steve T. Tillman, et al.,
Plaintiffs-Intervenors-Appellees,

v.

The INTERNATIONAL BROTHERHOOD OF BOILER MAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, LOCAL # 1509, Defendant-Appellant.

No. 81–2411.

United States Court of Appeals,
Seventh Circuit.

Argued April 2, 1982.

Decided Aug. 16, 1982.

Rehearing and Rehearing En Banc
Denied Sept. 27, 1982.

---

John A. Udovc, Milwaukee, Wis., for defendant-appellant.

Jonathan Wallas, Charlotte, N. C., for plaintiffs-appellees.

Before CUMMINGS, Chief Judge, POSNER, Circuit Judge, and LEIGHTON,* District Judge.

LEIGHTON, District Judge.

In this appeal by a local union of blacksmiths, we are asked to resolve two issues. First, whether the district court's findings of fact concerning the seniority system contained in the union's collective bargaining agreements with the Ladish Company of Cudahy, Wisconsin are clearly erroneous. Second, whether the district court erred in concluding that the seniority system in question is not bona fide within the meaning of Section 703(h) of Title VII because it was negotiated and maintained for the purpose, and with the intent and effect, of discriminating against Negroes employed by Ladish.

We hold that the district court's findings are not clearly erroneous; they are supported by substantial evidence in the record. And, in our judgment, the court was correct in concluding that the union's seniority system is not bona fide within the meaning of Section 703(h) of Title VII. Therefore, we affirm the district court. The following is a summary of its findings.

I

The Ladish Company is a major employer in the Milwaukee, Wisconsin area, the plant here involved being in Cudahy, a Milwaukee suburb. The company produces and finishes metal products; it does significant contractual work for federal agencies and has been in production since 1927. Ladish is a unionized employer; and during the time relevant to this case, it has had collective bargaining agreements with seven unions. However, the only one in this appeal is the appellant, Local # 1509 of the International Brotherhood of Boiler Makers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (hereafter referred to as the Blacksmiths).

Prior to World War II, few Negroes lived in the Milwaukee area. But in the post-war period, they began to migrate from the

* Honorable George N. Leighton, District Judge for the Northern District of Illinois, sitting by designation.

Deep South and settled in and around the city where their population increased steadily. They were limited in the purchasing of homes and the renting of apartments to areas of Milwaukee where living arrangements were substandard; and at the same time, there were racially discriminatory practices against Negroes in employment opportunities, in the location of schools, and in everyday social contacts. And at Ladish's Cudahy plant, no Negroes were employed prior to 1948; but their number in the workforce increased as the years progressed into the '50's.

The minimum ability requirements for the greatest majority of jobs in the Ladish plant were simple literacy and good health. Although the company sought skilled craftsmen to fill certain of the journeyman jobs and apprenticeable trades, most of its employees at the entry level were hired with little, if any, skills; consequently, most of them learned while on the job. The Negroes hired between 1948 and 1968 were neither less skilled, less qualified, nor less apt to learn job skills than were the Caucasians hired during the same period. All Negroes, however, were assigned jobs in the Machinists' unit, assignments that were solely made by Ladish, intentionally and based on race. The jobs to which the Negroes were assigned were mainly as grinders and truckers: the dirtiest, lowest paid, and least desirable.

During the same period, Caucasians hired by Ladish were assigned jobs in the Blacksmiths' bargaining unit, and under the jurisdiction of other union locals. It was Ladish's policy to allow inter-bargaining unit transfers by all of its employees during the period in question; but the seniority system maintained by the Blacksmiths and the other unions discouraged transfers by employees who had been with the company for a significant period of time because the result subjected an employee to possible layoff, or forced him to accept the least desirable job in his new unit. At various times from August 1949, Caucasian employees of Ladish transferred from jobs within the jurisdiction of other bargaining units to those within the jurisdiction of the Blacksmiths, all of them, for a period at least, utilizing their carryover seniority for layoff and recall purposes. However, no Negro employee succeeded in effecting such a transfer despite existing advantages in jobs under the Blacksmiths.

In 1973 and 1974, the Office of Federal Contract Compliance (OFCC) conducted an audit of Ladish's Cudahy facility which included an analysis of the company's then existing workforce. In response to OFCC requests, and in compliance with its obligations as a federal contractor, Ladish prepared detailed information concerning its employees. It listed all of Cudahy's hourly employees hired from August 1948 to December 1967, the distribution of those hirings by bargaining units, a list of those minorities the company hired prior to January 1, 1968 who were still employed in 1974, and a distribution of the company's hirings by bargaining unit. The audit eventually focused on whether Ladish's then existing workforce had an "affected class"; that is, a class consisting of employees who by virtue of past hiring discrimination, and by the nature of the limited seniority carryover provisions of the pertinent collective bargaining agreements, were in a position that they continued to suffer the present effects of past racially discriminatory acts. Based on its audit, its examination of documents and evidence furnished by Ladish, OFCC concluded that an affected class existed at Ladish, consisting of all Negroes who were hired by the company prior to January 22, 1968, and who were placed by Ladish in jobs under the jurisdiction of the Machinists.

## II

Shortly after the OFCC reached the conclusion that Ladish had an affected class of Negro employees who had suffered employment discrimination, the first of 18 Negroes employed by Ladish filed a charge of employment discrimination with the Milwaukee office of the Equal Employment Opportunity Commission, naming as respondents the Ladish Company and the seven unions with which it had collective bargaining agreements. He alleged that:

Prior to 1968, Ladish Company maintained a segregated hiring policy wherein all Black workers were hired into Union contracted Machinists jobs, which were the lowest paying jobs available at the Company. Such a policy has led to a current and continuing system of discrimination in seniority, wages and promotion. As a Black employee, I and others similarly situated, have been discriminated against as a result of Ladish's past policies of segregated hiring and resultant seniority and salary system. The affiliated Unions have contributed to this discrimination via the Union Contract.

On various dates thereafter, EEOC letters telling the complainants of their right to sue in the appropriate United States district court were issued; and on December 29, 1975, this suit was filed by 11 Negro employees of Ladish, on their behalf and on behalf of all others similarly situated. Later, seven other Negro employees filed similar EEOC charges, received letters concerning their right to sue; and on May 3, 1977, filed a motion for leave to intervene as plaintiffs in the suit. This was allowed; and on February 12, 1980, the district court granted, in part, plaintiffs' motion to certify the class, the order stating that:

> ... [F]or the purpose of determining the first claim, i.e., whether the seniority system maintained by the defendants ... is a 'bona fide seniority system' within the meaning of Section 703(h) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(h), this action is hereby certified as a class action on behalf of all blacks hired by the Ladish Company prior to January 22, 1968, who (1) were hired by the Ladish Company for jobs that were within the jurisdiction of the International Association of Machinists and Aerospace Workers, Local 1862, and (2) were employed by the Ladish Company as of December 30, 1969.

On the same date, the court granted a motion that severed the issue of liability from those of damages and remedies, in the event liability was established at trial. Then, at a conference held on November 3, 1980, plaintiffs, the Ladish Company, and four of the seven unions, informed the district judge that they were prepared to settle the case as to them.[1] They reported agreement to a proposed consent decree, and requested a hearing. Notices were issued to members of the class, a date was set for the court to hear objections, approve or disapprove the consent decree, and enter an appropriate order. The hearing, a lengthy one, was begun on December 22, 1980; and on February 13, 1981, the court reviewed the proposed consent decree in the light of many factors, and issued a Memorandum approving it. *Wattleton v. Ladish Co.*, 89 F.R.D. 677 (E.D.Wis.1981).

The effect of the settlement was to remove the Ladish Company and the four unions from the suit. This having been done, the remaining issues between plaintiffs, the remaining union locals: the Machinists,[2] the Die Sinkers,[3] and the Blacksmiths, were set for trial. They were heard to the court on plaintiffs' contention that (1) Ladish, with the full knowledge, cooperation and complicity of the three unions, maintained a policy and practice of hiring Negroes and assigning them to the dirtiest, lowest paying, and least desirable jobs within the jurisdiction of the Machinists; (2) Ladish, with the acquiescence of the three unions, maintained a policy of refusing to promote and transfer Negroes to better paying and more desirable jobs within their jurisdictions; (3) the three unions, by reason of seniority systems in their respective collective bargaining agreements, perpetuated the initial discrimination against Ne-

1. The unions were (1) International Federation of Professional and Technical Engineers, Local # 92 (IFPTE); (2) International Brotherhood of Firemen and Oilers, Local # 125 (IBFO); (3) International Brotherhood of Electrical Workers, Local # 494 (IBEW); and (4) Associated Unions of America, Local # 500 (AUA).

2. The International Association of Machinists and Aerospace Workers, District No. 10, Local # 1862 (Machinists).

3. International Die Sinkers Conference and Milwaukee Die Sinkers, Lodge # 140 (Die Sinkers).

groes because their seniority systems prevented them from transferring to better paying and more desirable jobs with full carryover seniority within the respective jurisdictions; and (4) that the Machinists' bargaining unit failed to properly and fairly represent its Negro members.

After hearing evidence, the district court made findings of fact and reached conclusions of law published in *Wattleton v. Ladish Co.*, 520 F.Supp. 1329 (E.D.Wis.1981). It found that during the period in question, all persons who were hired by Ladish and given jobs in the Machinists' and Die Sinkers' bargaining unit were accepted without regard to race or national origin, 520 F.Supp. at 1338; and that the Machinists did not fail to properly and fairly represent their Negro members. 520 F.Supp. at 1347. But as to the Blacksmiths, the district court weighed the credibility of four Negroes who testified about their work experience at Ladish, reviewed the record, and found that no Negro employee in the Cudahy plant transferred to a job under the jurisdiction of the Blacksmiths because its members, expressing its policy, made it clear to Ladish, and to the Negroes, that the local union would not accept them into its bargaining unit, 520 F.Supp. at 1341; that the OFCC determinations, the testimony of Ladish's Negro employees, and the operation of the challenged systems were persuasive evidence that the seniority provisions had perpetuated the effects of prior discriminatory practices and have carried their effects into the present, 520 F.Supp. at 1341; that the challenged seniority systems in the separate bargaining units were rational, in conformance with industry practice, and with the provisions of the National Relations Act, 520 F.Supp. at 1342; and that because they were originally negotiated at a time when Negroes were not employed at Ladish, the seniority systems of the three unions, including the Blacksmiths', did not have their genesis in racial discrimination. 520 F.Supp. at 1343.

Having made these findings, the court then turned to the question whether the challenged seniority systems, after their genesis, were thereafter negotiated and maintained free from any illegal purpose. 520 F.Supp. at 1343. It found that there being no evidence to the contrary, the Negro plaintiffs had not established that the seniority systems which existed under the collective bargaining agreements between Ladish, the Machinists, and the Die Sinkers were maintained with a purpose and intent to discriminate against them. 520 F.Supp. at 1346. But tracing the history of the Ladish-Blacksmiths' collective bargaining agreements, as it had in those between Ladish and the other two unions, the district court found that while the Blacksmiths' seniority system under examination was essentially the same as the one contained in the original agreement, the provisions had not been carried forward unchanged. In fact, there had been three changes, and all of them "coincided with the time Ladish first began to hire blacks in 1948 ... or with times of a steady increase in the hiring of blacks at Ladish." 520 F.Supp. at 1345.

The first change was included in the agreement effective August 22, 1949 to September 30, 1951 and provided that plantwide seniority would carry over to jobs under the jurisdiction of the Blacksmiths for purposes of layoff. This difference benefitted only Caucasians who, without difficulty, transferred into the Blacksmiths' bargaining unit; no Negro was successful in making such a transfer. The second was elimination, in the same collective bargaining agreement, of a nondiscrimination clause that was not again included in an agreement between Ladish and the Blacksmiths until passage of Title VII in 1964. The third was inclusion in the August 22, 1949 agreement of a provision regarding interbargaining unit transfers which stated that:

> Permanent inter-bargaining unit transfers will be made by agreement between Management and the Bargaining Committee of the unit to which the employee is being transferred.

The district court found that on August 22, 1949 "and thereafter, [this provision] gave the Blacksmiths virtual veto power over interbargaining unit transfers." 520 F.Supp. at 1345.

Based on the evidence that showed these three changes, the evidence relating to the feelings of individual blacksmiths toward transfers by Negroes to jobs in their unit, the evidence which showed that Caucasians transferred to jobs under the Blacksmiths with full carryover seniority while at the same time Negroes were discouraged from doing so; and having drawn reasonable inferences therefrom, the district court found "that the challenged seniority system contained in the Ladish-Blacksmiths' collective bargaining agreement, inter alia, was negotiated and maintained with a purpose of preventing only blacks from entering into jobs under the jurisdiction of the Blacksmiths." ... 520 F.Supp. at 1346; and, "that the seniority systems negotiated between Ladish and the Blacksmiths have and were intended to have a disparate impact on black workers at Ladish." 520 F.Supp. at 1347. Therefore, the court concluded that "the seniority system of the Blacksmiths is not bona fide within the meaning of 703(h) of Title VII." In this appeal, the Blacksmiths contend that the district court's findings are clearly erroneous; and that there was error in the conclusion reached.

### III

#### A

Rule 52(a), Fed.R.Civ.P., broadly requires that in a non-jury case the district court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses [sic]." *Pullman-Standard v. Swint*, —— U.S. ——, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). One purpose for this requirement is to aid review by affording a clear understanding of the ground or basis of the decision. *Complaint of Ithaca Corp.*, 582 F.2d 3, 4 (5th Cir. 1978). Another is to make definite just what is decided in order to apply the doctrine of estoppel and res judicata in future cases. Wright & Miller, Federal Practice & Procedure: Civil 2571. Finally, and perhaps more important, requiring the making of findings is intended

to evoke care on the part of the trial judge in ascertaining the facts. Wright & Miller, *supra*; and see *United States v. Merz*, 376 U.S. 192, 199, 84 S.Ct. 639, 643, 11 L.Ed.2d 629 (1964); *United States v. Forness*, 125 F.2d 928, 942 (2nd Cir. 1942), *cert. denied sub nom., Salamanca v. United States*, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764 (1942). A district court's findings are presumptively correct and the burden of persuading us that they are "clearly erroneous" rests upon the Blacksmiths. *Case v. Morrisette*, 475 F.2d 1300, 1305 (D.C.Cir.1973); see *Culbertson v. Jno. McCall Coal Company, Inc.*, 495 F.2d 1403, 1405 (4th Cir. 1974). But, in our judgment, they have not discharged this burden.

In so deciding, we have reviewed the record in order to make sure that the trial court adequately performed its function. *Ramey Const. Co., Inc. v. Apache Tribe, etc.*, 616 F.2d 464, 467 (10th Cir. 1980); *cf. Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1284 (7th Cir. 1977). However, "[w]e, as an appellate tribunal, may not retry the case or substitute our judgment for that of the trial judge. It is he, who after judging the credibility of the witnesses, weighing the evidence, and drawing inferences, makes factual determinations." *Brennan v. Midwestern United Life Insurance Company*, 417 F.2d 147, 149 (7th Cir. 1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970). These determinations are entitled to very careful consideration, *Bauer v. Bailar*, 647 F.2d 1037, 1042 (10th Cir. 1981); they are not to be set aside unless this court, on reviewing all the evidence, is left with a definite and firm conviction that a mistake has been committed. *Armstrong v. Brennan*, 539 F.2d 625, 634 (7th Cir. 1976), *vac., Brennan v. Armstrong*, 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977); *cf. Hayes v. Thompson*, 637 F.2d 483, 490 (7th Cir. 1980); see *Whitley v. Seibel*, 676 F.2d 245, 252 (7th Cir. 1982).

With these principles in mind, we notice that the district court heard the following evidence. First, the testimony of the Negro employees of Ladish who described their

experiences when they tried, or expressed the desire, to transfer from jobs under the jurisdiction of the Machinists to those in the Blacksmiths' bargaining unit. Second, the testimony of two experts, one an authority on the history of labor unions in this country, but particularly of the experiences of Negroes with racism in the American labor movement. Third, statistics which plaintiffs offered to show the disparity between the number of Negroes and Caucasians who, during the period 1948 and 1968, obtained transfers into the Blacksmiths; it appearing from the data that no Negroes transferred to the Blacksmiths while Caucasians did so without difficulty and in fact with carry-over seniority. Fourth, documents, but more important, copies of the collective bargaining agreements negotiated by the Die Sinkers, the Machinists, and the Blacksmiths; but as to the latter local union, the collective bargaining agreements contained changes which affected the Blacksmiths' seniority system. Fifth, the witnesses called by the Blacksmiths, some of them members of the Negro race, who testified in support of the local's contention that it had not negotiated or maintained a seniority system for the purpose of discriminating against Negroes because of their race.

The court weighed the evidence, resolved testimonial conflicts, and made findings concerning the parties, the communities in which they lived, the people from whom Ladish drew its workforce, and the racially discriminatory impact of the company's hiring and work assignment policies. It looked at the audit determinations made by the Office of Federal Contract Compliance in 1973, and the operation, over the years, of the challenged seniority systems. In judging the credibility of four of the Negroes who testified, the able and experienced district judge acknowledged, 520 F.Supp. at 1341, that "[s]uch a determination is, by nature, subjective; but determining whether invidious discriminating purpose was a motivating factor required a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v.*

*Metro. Housing Dev.,* 429 U.S. 252, 266, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977).

This was a proper discharge of judicial functions. Neither our examination of the record nor any point raised in this appeal leaves us with a definite and firm conviction that a mistake was committed by the district court in its factual findings; we cannot say that they are clearly erroneous. *Culbertson v. Jno. McCall Coal Company, Inc.,* 495 F.2d 1403, 1405 (4th Cir. 1974); *Davis v. Murphy,* 587 F.2d 362, 364 (7th Cir. 1978). Therefore, we turn to the question whether the court erred in concluding that the Blacksmiths' seniority system is not bona fide within the meaning of Section 703(h), Title VII.

### B

Title VII of the Civil Rights Act of 1964 makes unlawful practices, procedures, or tests that "operate to 'freeze' the status quo of prior discriminatory employment practices." *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). To this rule, Section 703(h) of the Act, 42 U.S.C. § 2000e–2(h) provides an exception:

> [I]t shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system, ... provided that such differences are not the result of an intention to discriminate because of race....

*California Brewers Ass'n v. Bryant,* 444 U.S. 598, 600, 100 S.Ct. 814, 816, 63 L.Ed.2d 55 (1980). This exception extends not only to Title VII actions, but also bars section 1981 claims. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1191–1192 (5th Cir. 1978). It applies to seniority systems with a disparate racial impact only when "differences in treatment [are] not the result of an intention to discriminate because of race." *International Bro. of Teamsters v. United States,* 431 U.S. 324, 353, 97 S.Ct. 1843, 1863, 52 L.Ed.2d 396 (1977); *Terrell v. United States Pipe & Foundry Co.,* 644 F.2d

1112, 1118 (5th Cir. 1981). Accordingly, it has been held that provisions for seniority rights "designed or operated to discriminate on an illegal basis is not a 'bona fide' system." *Acha v. Beame*, 570 F.2d 57, 64 (2nd Cir. 1978); and see *United Airlines, Inc. v. Evans*, 431 U.S. 553, 559, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

 Section 703(c)(1) of Title VII, 42 U.S.C. § 2000e–2(c)(1), provides that:

> It shall be an unlawful employment practice for a labor organization—
>
>> to exclude ... from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
>> . . . .

Thus, it is clearly a violation of this section for a union, international or local, to maintain a seniority system for the purpose of excluding Negroes from membership because of their race; and certainly, such a system is not protected by the exception in section 703(f) of Title VII. *Hameed v. Intern. Ass'n of Bridge, etc.*, 637 F.2d 506 (8th Cir. 1980); *Glus v. G. C. Murphy Co.*, 629 F.2d 248 (3rd Cir. 1980); *Freeman v. Motor Convoy, Inc.*, 409 F.Supp. 1100 (N.D.Ga. 1975); *United States by Clark v. United Papermakers & Paperworkers*, 282 F.Supp. 39 (E.D.La.1968). Therefore, after findings that the Blacksmiths negotiated and maintained their seniority system for the illegal purpose, and with the intent and effect, of discriminating against Negroes because of their race, the district court could only conclude that the system is not bona fide within the meaning of section 703(h) of Title VII. *International Bro. of Teamsters v. United States*, 431 U.S. 324, 346, 97 S.Ct. 1843, 1860, 52 L.Ed.2d 396 (1977); *Sears v. Atchison, Topeka & Santa Fe Ry. Co.*, 454 F.Supp. 158, 179 (D.Kan.1978); *rev'd on other grounds*, 645 F.2d 1365 (10th Cir. 1981). For these reasons, the judgment of the district court is affirmed.

---

\* On April 28, 1982, we granted appellants' motion to consider the case on the basis of the briefs and record alone.