Phyllis CHAMBERS,
Plaintiff–Appellant,

v.

PARCO FOODS, INCORPORATED,
Defendant–Appellee.

No. 90–1419.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1990.

Decided June 20, 1991.

Aladean M. DeRose, South Bend, Ind., for plaintiff-appellant.

Katharine B. Devoid, Richard L. Marcus, Sonnenschein, Nath & Rosenthal, Chicago, Ill., Donald W. Pagos, Sweeney, Dabagia, Donaghue & Thorne, Michigan City, Ind., for defendant-appellee.

Gwendolyn Young Reams, Vella M. Fink, Paul Bogas, Donald R. Livingston, E.E.O.C., Washington, D.C., for E.E.O.C. amicus curiae.

Before CUDAHY, FLAUM and MANION, Circuit Judges.

MANION, Circuit Judge.

Phyllis Chambers sued Parco Foods, Inc. for violating Title VII through its collectively bargained promotion and transfer policies. The district court granted summary judgment for Parco, holding that Chambers' claim was time-barred. We affirm.

## I.

The facts of this case are not in dispute. Parco makes holiday cookies at its plants in Michigan City, Indiana and Blue Island, Illinois. Both plants have six departments: packing, mixing, maintenance, warehouse, traffic and sanitation. As of November 1, 1988, the packing departments of both plants were primarily female, and the mixing departments were primarily male. At all relevant times, the lowest-paying job in the mixing department paid more than the highest-paying job in the packing department.

As one might imagine for a company that makes holiday cookies, the work is seasonal, requiring the greatest output and the most workers during the Christmas holiday season from October to January. Partly for that reason, Parco and the union in 1979 bargained for a departmental seniority system where employees in one department are not allowed to bid for jobs in another department. The specific provision is contained in Article VII, Section 3(C):

C. Bidding

Section 1. Seniority shall be the determining factor in matters affecting promotions, demotions and transfers within classifications, only if other factors of fitness and ability are equal.

(a) When an employee's job is eliminated, such employee shall have the right to exercise his seniority within the employee's department.

Section 2. When a vacancy occurs, or a newly created job, the company will post the job for three (3) days, and will then have one week to fill the new job. Employees within the department desiring to apply for this job will write their names and seniority status on the posted notice. The successful applicant will be chosen by the Employer on the basis of seniority, provided ability and fitness of the senior employee is equal to that of the other applicants.

Parco maintains this system of departmental seniority so that an experienced work force is guaranteed in each department, even during periods of fluctuating production demands and dramatic changes in number of employees. Stability appears to be the key. Without this provision, Parco would find itself with few experienced workers during both the slow season and the time of heavy production during the holiday season. In the off-season, reductions in force might knock out most of the experienced workers within a department, replacing them with workers from other departments who have greater plant-wide seniority. And during the busy season, Parco would have to train new workers to take the place of those who transferred to another department, and would also have to train the transferred employees to do their new jobs, during a time with heavy production demands.[1]

Phyllis Chambers, employed by Parco in the packing department since 1977, was a member of the union negotiating team that in 1979 agreed to Article VII, Section 3(C). While Chambers claims to have believed that section meant only that employer discretion would be eliminated in transferring employees within departments, since its enactment in 1979 Parco and the union have interpreted the provision as disallowing bids for transfers. The bidding provision

---

1. As the district court noted, "From the union's position, the system fostered employees' opportunities to be promoted and rewarded for their work record within their department, notwithstanding bids from more senior employees in other departments. From Parco Foods' standpoint, the system furthered continuity of the work force by encouraging employees to departmentalize their skills and work up the ladder within one section of the plant." Memorandum and Order, Jan. 23, 1990, at 3, 1990 WL 71511.

has been reenacted verbatim in subsequent collective bargaining agreements signed in 1984 and 1988, and the union has never attempted to negotiate a change in its terms.

On July 6, 1987, while working in the packing department, Chambers bid for a job in the mixing department. She was told she could not bid on jobs outside her department, and her application was not considered. Charles Glenn Tombs, a male employee with about one year's experience in the mixing department, but with far less plantwide seniority than Chambers, was hired. On July 31, 1987, Chambers filed a complaint with the Michigan City Human Rights Department alleging sex discrimination because Parco refused to let her bid on the position in the mixing department. The Human Rights Department made an initial finding of probable cause, but Chambers withdrew her complaint. On July 29, 1988, the Equal Employment Opportunity Commission (EEOC) issued a Notice of Right to Sue. Chambers sued in federal district court on September 14, 1988. The district court granted summary judgment for Parco on January 23, 1990, and Chambers timely appealed.

## II.

Parco made two arguments in support of its motion for summary judgment. First, Parco argued that Chambers' claim was untimely. Second, on the merits, Parco claimed that its policy is a bona fide seniority system. While Title VII prohibits sex discrimination in the terms and conditions of employment, Congress has created an exception where employment action occurs pursuant to a bona fide seniority system. *See* Title VII, 42 U.S.C. § 2000e–2(h). Even if Parco's plan is a seniority system, challenges still can be brought if discriminatory intent or purpose is shown.

The district court agreed with the preliminary argument that Chambers' claim was time-barred, and therefore did not reach the merits. The court concluded that Chambers' claim was untimely under 42 U.S.C. § 2000e–5(e), which allows 180 days to challenge unlawful employment practic-

es relating to seniority systems, or 300 days if administrative proceedings are pursued first. The allegedly discriminatory provision of the collective bargaining agreement went into effect in 1979, so under the 300–day provision Chambers' 1988 challenge was about eight years late. The court relied on *Lorance v. AT & T Technologies,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), in which the Supreme Court held that the statutory limitations period begins to run when the allegedly discriminatory seniority system is adopted. The Court specifically rejected the argument that the statute was triggered each time the system was applied in a discriminatory fashion. 109 S.Ct. at 2269.

■ Chambers advances two bases for reversal. Chambers first argues that Parco's prohibition of inter-departmental bidding is merely a no-transfer rule, rather than a "seniority system," and that the statute of limitations therefore does not apply. Parco argues that its bidding policy is an integral part of its seniority system. We agree with the district court that Parco's no inter-departmental bidding rule is part of its seniority system.

*Lorance* considered a seniority system legitimate even though seniority was determined by length of time spent in a particular position, instead of length of time with the company. 109 S.Ct. at 2265. The situation in *Lorance* is analytically no different than at Parco Foods; here, seniority is determined by length of time in one department, instead of length of time with the company. Parco, and the defendant in *Lorance,* justify their seniority systems as reasonable attempts to encourage workers to remain in and improve on the jobs they are doing, rather than to transfer within the company and require training for a new job. In this case, Tombs had one year in the mixing department; Chambers had none. To Parco, Tombs was the more qualified applicant with greater relevant seniority. That Chambers does not like the manner in which Parco's seniority system operates does not mean it is not a seniority system.

The EEOC's argument as amicus curiae suffers from this same defect. The EEOC does not like the fact that Chambers is treated as an entry-level applicant, the same as an outsider applying for a job in the mixing department. But the EEOC's concerns are properly the subject of future collective bargaining negotiations; they do not show that Parco's plan is not a seniority system. As the Supreme Court said in *California Brewers Association v. Bryant,* 444 U.S. 598, 606, 100 S.Ct. 814, 819, 63 L.Ed.2d 55 (1980), the "principal feature of any and every 'seniority plan' is that preferential treatment is dispensed on the basis of some measure of time served in employment." The key words, which the EEOC chooses not to emphasize, are "some measure of time." Parco's measure of time is based on experience within a particular department, for which Chambers will receive preferential treatment. Parco's measure of time is sufficient to show that its no inter-departmental bidding rule is indeed part of a seniority system.

■ Chambers' second argument for escaping the statutory limitations period presents a question of first impression. She argues that each subsequent reenactment of an allegedly discriminatory seniority system re-triggers the limitations period. Therefore, she argues, the reenactment of Article VII in 1988 was a new discriminatory event that made her 1988 lawsuit timely. The district court rejected this reasoning on the basis of *Lorance,* but we do not believe *Lorance* provides us such a clear answer.

Several factors support the district court's analysis. Although *Lorance* did not involve a collective bargaining agreement that was subsequently reenacted, the Court seemed to focus on the moment when a system changes from nondiscriminatory to discriminatory—a "diminution in employment status"—as the moment triggering the limitations period. In *Lorance,* the Court described this crucial moment in a manner that discounts the importance of prior or future verbatim reenactments of the same provision:

> Under the collective bargaining *agreements* in effect prior to 1979, each petitioner had earned the right to receive a favorable position in the hierarchy of seniority among testers ..., and respondents eliminated those rights for reasons alleged to be discriminatory. *Because this diminution in employment status* occurred in 1979 ... the Seventh Circuit was correct to find petitioner's claims time-barred....

*Lorance,* 109 S.Ct. at 2265. The Court did not refer to the most recent reenactment of the collective bargaining agreement, but noted that previous "agreements" preserved certain rights for the workers. Then the Court focused on the point when those rights were allegedly diminished by a change in the collective bargaining agreement.

In our case, there was no "diminution in employment status" during subsequent verbatim reenactments of the allegedly discriminatory Article VII; that "diminution" occurred in 1979 when the agreement's terms were changed from previous agreements. The district court concluded that allowing each subsequent verbatim reenactment of a collective bargaining agreement to start the limitations clock running again would defeat the workers' valid reliance interests the Supreme Court sought to protect in *Lorance*: "[A]llowing a facially neutral system to be challenged, and entitlements under it to be altered, many years after its adoption would disrupt those valid reliance interests [that the limitations period] was meant to protect," and upset the "balance between the interests of those protected against discrimination by Title VII and those who work—perhaps for many years—in reliance upon the validity of a facially lawful seniority system." 109 S.Ct. at 2269.

However, the *Lorance* Court generally refers to a seniority system's point of "adoption" as the point at which the statute of limitations begins to run. 109 S.Ct. at 2269. In rejecting the plaintiffs' argument that the statute should be triggered when the effect of the decision to adopt the seniority provision was felt, the Court explained that "[b]ecause the claimed invalidi-

ty of the facially nondiscriminatory and neutrally applied ... seniority system is wholly dependent on the alleged illegality of signing the underlying agreement, *it is the date of that signing which governs the limitation period."* 109 S.Ct. at 2268 (emphasis added). The Court pointed out that in a facially neutral system "the discriminatory act occurs *only* at the time of adoption," 109 S.Ct. at 2269 n. 5 (emphasis in original).

■ So, under *Lorance,* the time of adoption is the discriminatory act, and the discriminatory act triggers the statute of limitations. Can maintaining an allegedly discriminatory provision be considered a discriminatory act? We believe that it can, provided that the plaintiff can point to evidence of a discriminatory act or discriminatory intent in the provision's reenactment. Established caselaw interpreting § 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), indicates that maintenance of an allegedly discriminatory seniority system can be considered a discriminatory act. In *Pullman–Standard v. Swint,* 456 U.S. 273, 281, 102 S.Ct. 1781, 1786, 72 L.Ed.2d 66 (1982) (citations omitted), the Supreme Court inquired whether a seniority system "was negotiated and has been maintained free from any illegal purpose," and observed that the district court had "carefully considered the detailed record of negotiating sessions and contracts which span a period of some thirty-five years." The court made this in-

quiry even though the relevant seniority provision had remained unchanged over the years through many renegotiations. The implication is that if the parties have discriminatory reasons for reenacting seniority provisions, even when they do not change the system, the reenactment can be considered discriminatory for purposes of § 703(h). *See also Teamsters v. United States,* 431 U.S. 324, 355–56, 97 S.Ct. 1843, 1864–65, 52 L.Ed.2d 396 (1977); *Wattleton v. Intl. Brotherhood of Boiler Makers,* 686 F.2d 586, 590, 592 (7th Cir.1982).

Thus, if a plaintiff can point to evidence of discriminatory motive in the renegotiation or "maintenance" of a seniority system, then that date provides the time at which the statute of limitations begins to run, for it is at that point that the "discriminatory act" took place.

All of this is no help to Chambers, however. The record in our case is uncontroverted that not only was Article VII reenacted verbatim, but the provision was never even a matter of discussion between Parco and the union.[2] The union never sought to renegotiate the terms of the allegedly discriminatory provision, so there is nothing Chambers can possibly point to that would show Parco's discriminatory intent. Without an act or statement in the renegotiation process that would be probative of discriminatory intent, the renegotiation date cannot be the starting point for the statute of limitations.[3] Therefore, the

**2.** Pursuant to General Rule 11 of the Northern District of Indiana, Parco filed in conjunction with its motion for summary judgment a "Statement of Material Facts As To Which There Is No Genuine Issue." Paragraph 22 stated: "At no time since 1979 has the Union requested a change in the no inter-departmental transfer rule. The collective bargaining agreement was renegotiated and a new collective bargaining agreement was signed on April 1, 1988, without any request by the Union to change the no inter-departmental transfer rule." Chambers has never attempted to contest this statement, either in her own statement of material facts to the district court, or in her briefs on appeal. Under General Rule 11, the district court was required to "assume that the facts as claimed by the moving party are admitted to exist without controversy...."

**3.** The dissent sidesteps the precedential force of *Lorance* by suggesting a different resolution is

mandated by simple rules of contract. The dissent fails to point out that, even under its approach, Chambers' claim here is barred. Chambers' 1987 job bid and subsequent complaint to the Michigan City Human Rights Commission were untimely attacks on the April 1984 agreement then in effect. Her September 1988 lawsuit was not only untimely but also moot because it was a continuing challenge to the 1984 agreement which had been replaced by a new agreement enacted in April of 1988. And her lawsuit could not be construed as an attack on the April 1988 agreement because, first, she never bid on a job under that agreement, and second, she never went before the Human Rights Commission or the EEOC with a discrimination claim based on the April 1988 reenactment. If we are to apply a "simple contract rule that a new agreement gives rise to new cause of action" the old cause of action Chambers still pursues is moot.

judgment of the district court dismissing Chambers' claim as untimely is

AFFIRMED.

CUDAHY, Circuit Judge, dissenting.

First, I entirely agree that the "no inter-departmental bidding rule" or "no transfer" rule is a rule of seniority and governed by *Lorance*.

Second, I commend the majority for recognizing that the reenactment of seniority provisions in subsequent labor contracts *may* very well re-start the statute of limitations.

I must, however, depart from the majority's analysis (and result) in upholding summary judgment because the provision in question here was not discussed at the bargaining stage nor did the union seek a change in the provision at that time. The record does not disclose what the employer might have sought. But, even if all parties were quiet as church mice at contract time, as an objective matter they *acted to maintain* an allegedly discriminatory provision and thereby marked an appropriate starting point for the statute of limitations.

Even though *Lorance* speaks of seniority *systems* as the sources of reliance interests, the "systems" are, of course, based on contracts having definite terms. The legal basis of reliance is these term contracts, and there is nothing in *Lorance* to suggest otherwise. All the provisions of a collective bargaining agreement, including the seniority provisions, expire when its term comes to an end, and they, of course, do not continue to govern from the grave.[1] And, as a matter of law, new (even if identical) provisions of a new contract must be agreed upon for a seniority "system" to continue in existence. Legally, one has no more right to rely on the "old" carry-over

terms of a labor agreement than on the "new" terms included for the first time. I think, therefore, that it is fundamentally erroneous to give a different effect (for statute of limitations purposes) to contract terms which have existed in earlier contracts than to terms appearing for the first time. *Cf. Legutko v. Local 816, Int'l Bhd. of Teamsters,* 853 F.2d 1046 (2d Cir.1988) (relevant date for challenge to rider to collective bargaining agreement was reenactment date, not original enactment). *But see American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982).

The distinction made by the majority is based essentially on the idea that the discriminatory intent which can be identified with the earlier collective bargaining agreement must be re-identified with the same provisions when they are "maintained" in a subsequent agreement. It seems to me this is wrong. There is no reason to conclude that the intent that gave rise to a contract provision originally is not the same intent that leads to its maintenance in a new agreement. All the majority can say here is that the matter was not discussed. If we are going to deal in presumptions, I would certainly think that lack of discussion would signify continuance of whatever intent governed the original adoption of the disputed provision. The legal act giving rise to the cause of action here is therefore (1) adoption of a new contract (2) containing seniority provisions (3) .which were inspired by the same motives that brought about their original adoption. It is not, as the majority seems to suggest, the mere unintended continuation of a discriminatory regime, but a knowing re-acceptance of that system and its effects. If we decide to the contrary, we are left with the parties sitting "innocently" around the bargaining

---

1. In *Lorance* itself, 490 U.S. at 901–02, 109 S.Ct. at 2263–64, the plaintiffs (who had begun work under the old plant-wide seniority system) lost seniority rights accrued under the old system and thereby suffered demotion and other injuries. Their reliance interests in their seniority status under the old "system" were defeated because a new contract supplanted the old. They had no rights under the old system, and their only option was to argue that the new system violated the anti-discrimination laws, an argument never reached because they made it too late. In its statute of limitations analysis, the majority here contrives a flawed distinction not only between seniority rights and other rights under collective bargaining agreements but also between efforts to enforce contractual seniority rights (in which only terms of the latest bargaining agreement control) and efforts to enforce statutory discrimination prohibitions.

table but thinking the darkest of discriminatory thoughts as they once again adopt a contract provision that was intended originally to discriminate. This does not seem to me to be either psychologically or legally tenable.

In *Lorance,* the concern of the Supreme Court was in protecting employees' reliance interests in rights granted them by a seniority system in being over a period of time. But how can they have a right to rely on old contracts no longer in force? Their reliance must be on the present contract which could have contained seniority rules entirely different from the preceding contract but, through the purposeful act of its signatories, in fact contained the same rules.

Essentially, it seems incorrect to make the *limitations* question turn on inferences of intent at the time of reenactment of the seniority provisions. It is possible, in theory at least, for a seniority provision originally conceived as discriminatory to be carried over to subsequent contracts without discriminatory intent,[2] but it seems to me this is a question going to the merits and not one to be invoked in determining the limitations period.

Quite apart from its difficulties of principle, I do not understand how the majority's approach can be followed in practice. How does one determine the intent which accompanies the maintenance of an existing seniority rule? Suppose one party proposes an even more discriminatory rule, but the pre-existing rule is retained in the knowledge that it too is discriminatory. Under the majority's analysis, the statute would presumably run anew under these facts. But if all minds were blank, the statute would not run. How does one prove that minds were blank, and what presumptions are appropriate? The practical difficulties seem to me insurmountable.

Nor can we ignore that the question before us is how to determine a starting point for the statute of limitations. The majority's approach suggests the possibility of a trial on the merits simply to decide whether the action was timely filed, a departure from our usual limitations inquiries which merely focus on the date of the *allegation* of wrongdoing. I would adopt the simple contract rule that a new agreement gives rise to new causes of action—even though similar causes of action might have arisen under older contracts with identical provisions.

I therefore respectfully dissent.[3]

---

2. For example, an employer might propose altering the way seniority rights are determined based on what it now recognizes as potential liability for instituting the old system. The union responds that its members rely on that system, and it would be remiss in accepting a change. To compromise, the two sides work out a deal outside the seniority system by which members of the group suffering from discrimination receive adequate compensatory benefits. The trial judge would then be free to decide, on the merits, whether the compromise effectively dismantled the discriminatory structure. Such a scenario was apparently played out as a post-litigation compromise between the employer and the government in *Pullman–Standard, Div. of Pullman, Inc. v. Swint,* 456 U.S. 273, 279 n. 7, 102 S.Ct. 1781, 1785 n. 7, 72 L.Ed.2d 66 (1982) (without altering seniority system, employer agreed to allow certain minority workers to transfer departments without loss of seniority).

3. In the margin, *ante* at 9 n. 3, the majority draws additional support from the timing of the plaintiff's agency filing, which occurred prior to the most recent reenactment of the seniority system. Discriminatory actions taking place after the agency filing but before litigation in the district court commences may be taken into account in overcoming an otherwise untimely agency filing. *See Noble v. University of Rochester,* 535 F.2d 756 (2d Cir.1976); *Egelston v. State University College at Geneseo,* 535 F.2d 752 (2d Cir.1976). The majority's objection would apparently have been met had the plaintiff refiled the same agency complaint after the date of reenactment. Where as here the agency's role is essentially one of mediation, there is little purpose in requiring repetitive filings while the agency considers the matter. *Cf. Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (Title VII's requirement of timely agency filing is not jurisdictional). In this case, the agency itself probably believed the filing timely under the "continuing violation" theory adopted by a number of circuits at that time, *see Cook v. Pan Ameri-*

*can World Airways,* 771 F.2d 635, 646 (2d Cir. 1985), *cert. denied,* 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986); *Patterson v. American Tobacco Co.,* 634 F.2d 744, 750–51 (4th Cir. 1980), *vacated on other grounds,* 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982); *Morelock v. NCR,* 586 F.2d 1096, 1102–03 (6th Cir.1978), *cert. denied* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979), and the defendant certainly cannot complain of surprise, given its reenactment of the offending provision *after* it was made aware of the plaintiff's intent to bring this action.